UNITED STATES of America

v.

Dean Anthony BECKFORD.

Criminal No. 3:96CR66–01.

United States District Court,
E.D. Virginia,
Richmond Division.

March 28, 1997.

David Novak, Stephen Miller, Andrew McBridge, Asst. U.S. Attys., Richmond, VA, for Government.

Gerald T. Zerkin, Robert J. Wagner, Richmond, VA, for Beckford.

## MEMORANDUM OPINION

PAYNE, District Judge.

Dean Beckford has been indicted for his alleged leadership role in the so-called "Poison Clan" drug trafficking organization. Specifically, Beckford is charged in the Superseding Indictment with racketeering violations (Count 1); racketeering conspiracy (Count 2); conspiracy to distribute "crack" and powder cocaine (Count 3); participation in a Continuing Criminal Enterprise (Count 4); and two counts of murder in furtherance of a Continuing Criminal Enterprise (Counts 5 and 6). The Government has filed Notice of Intent to Seek Sentence of Death, pursuant to 21 U.S.C. § 848(h)(1)(A), for Beckford's alleged involvement in the two murders charged in Counts Five and Six.

Beckford[1] seeks to suppress evidence seized pursuant to a search warrant which was issued by a state court and executed by local police on October 11, 1989 at a drug "stash" house at 2222 West Grace Street in Richmond, Virginia. Beckford alleges that the search was violative of the Fourth Amendment because the executing officers failed to "knock and announce" their presence before entering the residence.

For the reasons set forth below, the motion to suppress is denied.

## BACKGROUND

Count 6 of the Superseding Indictment charges Beckford, along with co-defendant Claude Dennis, with the murder of Sherman Ambrose in furtherance of a Continuing Criminal Enterprise. The aftermath of the Ambrose murder spawned state criminal proceedings which form the factual backdrop for this motion.

On December 4, 1988, Ambrose, one of the alleged drug dealers for the Poison Clan, was murdered at 1514 Tifton Court in Richmond, Virginia. Shortly thereafter, a warrant was issued for the Beckford's arrest for the Ambrose murder on December 9, 1988 by a magistrate judge of the General District Court for the City of Richmond. After that warrant was issued, Beckford and others were indicted by a state grand jury for Malicious Wounding, Use of a Firearm in the Commission of a Felony, and Distribution of Cocaine. The Malicious Wounding charge related to Beckford's alleged shooting of Tracy Lavache, a fellow member of the Poison Clan.[2]

Upon further investigation of the Ambrose murder and other crimes allegedly committed by members of the Poison Clan, Richmond Police learned that 2222 West Grace Street in Richmond, Virginia was used as a drug "stash" house by Beckford and others in the Poison Clan organization. On October 10, 1989, Richmond Police Detective John Buckovich procured a search warrant for 2222 West Grace Street. The search warrant was to secure evidence such as weapons, cocaine, and drug paraphernalia pertaining to the commission of the following offenses: Illegal Possession of Cocaine with the Intent to Distribute; Murder; Use of a Firearm in the Commission of a Felony; and Malicious Wounding.

Detective Buckovich offered the following averment of probable cause in the affidavit which was presented in support of the requested search warrant:

> Within the last past 30 days the RICH-MOND BUREAU OF POLICE has been conducting an investigation and surveillance of drug distribution, homicide, and

---

1. Dean Beckford's brother, Devon Beckford, and his cousin, Richard Beckford, are also named as defendants in the Superseding Indictment. Devon Beckford is still at large; Richard Beckford is in custody. All references herein to Beckford shall mean Dean Beckford, unless specifically stated otherwise.

2. At the time of the search, Lavache, who himself was charged for the murder of one Mark Teeter, was in the custody of Richmond police. Lavache was found near death in Williamsburg, Virginia on October 9, 1989, two days before the search

of 2222 West Grace Street. Lavache informed the authorities that Beckford shot him twice in the chest, transported him (Lavache) in the trunk of a car, and left him for dead on the side of a highway near Williamsburg. Incredibly, Lavache lived to tell his story; after "playing dead," Lavache managed to catch the attention of a passing driver by throwing his shoe at the moving vehicle. That driver notified the authorities who took Lavache to a hospital. Following extensive treatment, Lavache recovered from his near fatal wounds.

aggravated assaults which have originated in and about the 1800 blk of Rose Ave and 2222 West Grace Street, 1st Floor. During this time numerous undercover buys have been made from the following subjects: B/M aka "Country", B/M aka "James", B/M aka "Boogie". All of these subjects are known to stay at 2222 W. Grace, 1st Floor.

During the course of the investigation it was discovered through a reliable informant that the bulk of the drugs sold by the above listed subjects is being stored at 2222 W. Grace, 1st Floor. Within the last past 4 days this reliable informant has been at 2222 W.Grace, 1st Floor, and has seen cocaine at that address. The reliable informant stated that within the past 6 months there has never been an occasion when the informant was at 2222 W. Grace Street, 1st Floor, that there has not been drugs at the house.

The informant stated that there are subjects who stay at 2222 W.Grace, other than those listed, and that all the subjects there are well armed with firearms and known to have been involved in numerous shootings. They have bragged repeatedly that they will not hesitate to shoot anyone.

The informant has used cocaine in the past and is familiar with its appearance for street distribution.

Dean Beckford, Country, and James have been indicted by the Richmond Grand Jury for Malicious Wounding, Use of a Firearm in the Commission of a Felony, and Distribution of Cocaine.

The reliable informant stated that the firearms used in the shootings by these subjects are thought to still be in the possession of them.

This informant has given information which has been proven truthful through independent police investigation.

Search Warrant, Section 4.[3] The search warrant was then issued on October 10, 1989 at 3:37 P.M.

Because of the extensive violence and the history of firearms possession and use associated with the Poison Clan drug trafficking organization, the Richmond SWAT unit was placed in charge of executing the search warrant on October 11, 1989. In preparation for the execution of the search warrant, the SWAT unit drafted an operations plan referred to as "Operation Early Riser." The text of that plan repeatedly refers to firearms and violence associated with members of the organization.

In the early morning hours of October 11, 1989, the SWAT unit executed the search warrant at 2222 West Grace Street. Immediately before execution of the warrant, the SWAT unit evacuated the neighboring houses on each side of the target residence because they feared an armed confrontation with the occupants of the apartment. Anticipating potential resistance to the execution of the warrant, the SWAT unit forcibly entered 2222 West Grace Street without knocking or announcing their identity. Inside, they found Beckford, who was asleep on the couch in his underwear. The SWAT unit arrested Beckford [4] and another of his co-conspirators, Heston Benjamin. The first-floor apartment at 2222 West Grace Street, which was the object of the search, was rented by Mervin Benjamin, the brother of Heston Benjamin and a co-defendant of Beckford in this case. The search of the apartment produced two firearms, narcotics, money and various drug paraphernalia.

---

3. At the suppression hearing, Detective Buckovich testified that the information provided by the confidential informant was corroborated by monitored conversations during controlled drug transactions between the informant and occupants of 2222 West Broad Street.

4. Upon arrest, Beckford supplied the fictitious name of "Daniel Davis." Apparently, Beckford concealed his true identity in order to avoid arrest on the outstanding warrant for the murder of Sherman Ambrose. The strategy was successful because the police failed to properly identify Beckford and he was released on bond without having been arrested on the murder warrant. Thereafter, he fled and remained at large in New York City until December, 1996, when he was arrested on the charges which are the subject of the Superseding Indictment in this case.

## DISCUSSION

### A. Standing to Challenge Search Under the Fourth Amendment.

The first-floor apartment at 2222 West Grace Street was rented by Beckford's co-defendant Mervin Benjamin. Allegedly, the Poison Clan, under the direction of Beckford, used the apartment to distribute and store "crack" cocaine. The Government asserts that Beckford lacks standing to challenge the search because Beckford's only connection to this residence "stems from his leadership role in the Poison Clan and his own role in distributing 'crack' cocaine from this location." Government's Response in Opposition to Defendant's Motion to Suppress at 6.

### 1. The Legal Standard Governing Fourth Amendment Standing.

The predicate to a Fourth Amendment challenge to a search is a showing of standing. *Rawlings v. Kentucky*, 448 U.S. 98, 104–06, 100 S.Ct. 2556, 2561–62, 65 L.Ed.2d 633 (1980); *United States v. Rusher*, 966 F.2d 868, 874 (4th Cir.), *cert. denied*, 506 U.S. 926, 113 S.Ct. 351, 121 L.Ed.2d 266 (1992). Since the landmark decision in *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), it has been settled that "capacity to claim the protection of the Fourth Amendment depends ... upon whether the person who claims the protection of the Amendment has a legitimate expectation of privacy in the invaded place." *Rakas v. Illinois*, 439 U.S. 128, 143, 99 S.Ct. 421, 430, 58 L.Ed.2d 387 (1978). A subjective expectation of privacy is legitimate if it is " 'one that society is prepared to recognize as "reasonable." ' " *Id.* at 143–44, n. 12, 99 S.Ct. at 430, n. 12 (*quoting Katz*, 389 U.S. at 361, 88 S.Ct. at 516 (Harlan, J., concurring)).

Fourth Amendment rights are personal in nature and protect only an individual that has a legitimate expectation of privacy in the area searched. *Bonner v. Anderson*, 81 F.3d 472, 475 (4th Cir.1996); *United States v. Wellons*, 32 F.3d 117, 119 (4th Cir.), *cert. denied*, 513 U.S. 1157, 115 S.Ct. 1115, 130 L.Ed.2d 1079 (1995). Of course, the burden is upon the defendant to show that he has a reasonable expectation of privacy in the area searched. *United States v. Rusher*, 966 F.2d at 874; *United States v. Horowitz*, 806 F.2d 1222, 1224 (4th Cir.1986).

■ The Government correctly argues that a defendant cannot present a cognizable suppression motion simply because he has a "supervisory role in the conspiracy or joint control over the place or property involved in the search or seizure." *United States v. Al–Talib*, 55 F.3d 923, 931 (4th Cir.1995) (*following United States v. Padilla*, 508 U.S. 77, 113 S.Ct. 1936, 123 L.Ed.2d 635 (1993)). And, a defendant's drug activities within a residence are insufficient to confer standing upon him to attack the execution of a search warrant at that location. *See United States v. Hicks*, 978 F.2d 722, 724 (D.C.Cir.1992); *United States v. Randle*, 966 F.2d 1209, 1212–13 (7th Cir.1992); *United States v. McNeal*, 955 F.2d 1067, 1069–71 (6th Cir.), *cert. denied*, 505 U.S. 1223, 112 S.Ct. 3039, 120 L.Ed.2d 908 (1992).

The ultimate question in determining standing to contest an illegal search of a residence is whether one's claim to privacy from governmental intrusion is reasonable in light of all the surrounding circumstances. *See Rakas v. Illinois*, 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978); *Bumper v. North Carolina*, 391 U.S. 543, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968). A person who lives at a residence has a reasonable expectation of privacy, even if he is not continuously on the premises or is not on the premises at the time of the search. *See Bumper v. North Carolina*, 391 U.S. 543, 548 n. 11, 88 S.Ct. 1788, 1791 n. 11, 20 L.Ed.2d 797 (1968) ("there can be no question of the petitioner's standing to challenge the lawfulness of the search" where he was the "one against whom the search warrant was directed," the house searched was his home, and where the weapon seized was used by all members of the household and was found in the common part of the house); *Alderman v. United States*, 394 U.S. 165, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969) (individual's property interest in his home was so great as to allow him to object to electronic surveillance of conversations emanating from his home, even though he himself was not a party to the conversations). Further, the Supreme Court has recognized

that overnight guests generally have standing to challenge police intrusion of their overnight residence. *Minnesota v. Olson*, 495 U.S. 91, 110 S.Ct. 1684, 109 L.Ed.2d 85 (1990); *Rakas v. Illinois*, 439 U.S. at 144 n. 12, 99 S.Ct. at 430 n. 12.

It is these principles which provide the standards for measuring the Government's contention that Beckford lacks standing to challenge the October 11, 1989 search of 2222 West Grace Street.

**2. Beckford's Standing to Challenge Search at 2222 West Grace Street.**

■ There is essentially uncontroverted evidence that Beckford was a permanent resident of the apartment at 2222 West Grace Street. On June 15, 1990, Tracy Lavache testified on behalf of the state at the state prosecution of Claude Dennis [5] for the abduction and assault of Lavache, for which he was ultimately acquitted. In his testimony, Lavache, who also is a Government witnesses in this case, stated that "Claude [Dennis], Dean [Beckford], me, Benjie [Benjamin], Tom Pile and James" were living at 2222 West Grace Street at the time of the Lavache assault on October 9, 1989. *Commonwealth v. Dennis*, Trial Transcript (June 15, 1990) at 12. It is reasonably inferable, then, that Beckford also was living at the apartment two days later when the search occurred.

Furthermore, the record suggests that Beckford was, if not a permanent resident at 2222 West Grace Street, at least an overnight guest at the apartment on the night of the search. At the time of the "no-knock" entry, which was executed in the early morning hours of October 11, 1989, Beckford was found asleep in his underwear on a couch in the residence. That is certainly *prima facie* evidence that Beckford was at least spending that night at the apartment. Moreover, the documents on which the warrant was issued show that the police expected Beckford to be staying at the apartment on the night of the search. That is clearly shown by the fact that Beckford is listed as a "person to be searched" in the affidavit for the search warrant. Search Warrant, Section 2.

It should be noted, however, that, even if Beckford *was* an overnight guest at the apartment on the night of the challenged search, there is some question as to whether the rationale of *Minnesota v. Olson* actually confers standing upon Beckford. In *Olson*, the Supreme Court recognized that "[t]o hold that an overnight guest has a legitimate expectation of privacy in his host's home merely recognizes the everyday expectations of privacy that we all share." 495 U.S. at 98, 110 S.Ct. at 1689. In that case, the defendant, who was the boyfriend of the owner of the searched premises, slept on the floor of the apartment the night prior to the search; and, the defendant had a change of clothes with him at the apartment. Presented with those circumstances, the Court held:

> Because respondent's expectation of privacy in the Bergstrom home was rooted in *"understandings that are recognized and permitted by society,"* Rakas [*v. Illinois*, 439 U.S.] at 144, n. 12, 99 S.Ct., at 431, n. 12, it was legitimate, and respondent can claim the protection of the Fourth Amendment.

*Id.* at 100, 110 S.Ct. at 1690 (emphasis added). In *Rakas*, the Court emphasized that where a person's presence at a residence is "wrongful," any expectation of privacy he might be entitled to may not be considered "legitimate." The Court in *Rakas* went on to explain that:

> Obviously, however, a "legitimate" expectation of privacy by definition means more than a subjective expectation of not being discovered. A burglar plying his trade in a summer cabin during the off season may have a thoroughly justified subjective expectation of privacy, but it is not one which the law recognizes as "legitimate." *His presence ... is "wrongful"; his expectation is not one that society is prepared to recognize as "reasonable."* ... Legitimation of expectations of privacy by law must have a source outside of the Fourth Amendment, either by reference to con-

---

5. Dennis, like Beckford, is named as a defendant in the Superseding Indictment in this case; the Government has filed Notice of Intent to Seek Sentence of Death for Dennis' alleged involvement in the two murders charged in Counts Five and Six.

cepts of real or personal property law or *to understandings that are recognized and permitted by society.*

439 U.S. at 143 n. 12, 99 S.Ct. at 430 n. 12 (emphasis added) (internal quotations and citations omitted).

The Government relies on the language from *Rakas* and the decision in *United States v. Hicks,* 978 F.2d 722 (D.C.Cir.1992), to support its contention that Beckford's nexus with 2222 West Grace Street (*i.e.,* Poison Clan drug trafficking activities) did not confer on him a legitimate expectation of privacy in that dwelling. In *Hicks,* the defendant was using his friend's apartment to conduct illegal drug trafficking activities. To support his standing to challenge a search of that apartment, Hicks argued that he was a legitimate overnight guest under *Minnesota v. Olson.* The D.C. Circuit stated: "In evaluating Hicks' legitimate expectation of privacy, we [ ] find it material that Hicks treated the apartment as a base for his business operations, not as a sanctuary from outsiders." *Hicks,* 978 F.2d at 724. For that reason, the court held that Hicks' expectation of privacy as an overnight guest was not reasonable or legitimate within the meaning of *Olson. Id.* at 723–24.

Beckford's case, however, is distinguishable from the situation presented in *Hicks.* First, in *Hicks,* there was no evidence that the defendant was a permanent resident of the searched apartment. Here, however, there is uncontroverted evidence that Beckford lived at 2222 West Grace Street. Second, the connection between drug trafficking activities and Hicks' presence in the apartment was much more immediate than in Beckford's case. Specifically, immediately before the search in *Hicks,* the defendant invited an undercover officer into the house to engage in a drug transaction. In this case, Beckford was asleep when entry was made. Lastly, unlike Beckford, Hicks presented weak evidence in support of the claim that he was actually an overnight guest because Hicks had only arrived a few hours before the undercover officer appeared and had brought along some liquid refreshments and ice, all of which suggested something less than an overnight stay.

It is further significant that, in *Hicks,* the court observed that certain excluded evidence that the defendant had been asleep on a couch when the undercover officer arrived (if it had been considered) "would make the standing question closer, if only because Hicks would have approached the status of an overnight guest." *Id.* at 724.[6] In this case, similar evidence establishes that, if Beckford was not a resident, he was an overnight guest at 2222 West Broad Street at the time of the search.

However, there is at least some evidence, provided by Lavache and the Government's confidential informant, that Beckford's presence at the searched apartment was related to the Poison Clan's drug trafficking activities for which that apartment allegedly served as a "stash" house and a base of operations. And, it may very well be that, under the teachings of *Olson* and *Rakas,* an overnight guest whose stay is necessitated by, or related to, drug trafficking activities may not have a "legitimate expectation of privacy" in the premises because presence as an overnight guest solely for the purpose of engaging in drug trafficking "is wrongful; [and defendant's] expectation is not one that society is prepared to recognize as reasonable." *Id.; see also Minnesota v. Olson,* 495 U.S. at 100, 110 S.Ct. at 1689.

It is unnecessary to decide that question, however, because in this case there is uncontroverted evidence that Beckford lived at 2222 West Grace Street. Therefore, as a permanent resident of 2222 West Grace Street, *Bumper v. North Carolina,* 391 U.S. at 548, 88 S.Ct. at 1791 n. 11, Beckford has standing to challenge the "no knock" entry even if he was using his residence for an unlawful purpose.

### B. The Fourth Amendment "Knock and Announce" Doctrine.

#### 1. The Legal Standard Governing Entry of Premises.

█ It is generally required that officers armed with a search warrant give notice of

---

**6.** Because this evidence was adduced at trial, and not during the suppression hearing, the court held that it was not cognizable on appellate review of the district court's denial of the motion to suppress. *Hicks,* 978 F.2d at 724–25.

their authority and purpose before entry of the premises to be searched. The concern in this section of the opinion is with the constitutional dimensions of this so-called "knock and announce" requirement.

The "knock and announce" doctrine has been traced back through English common law as far as the decision in *Semayne's Case*, 5 Coke 91, 77 Eng. Rep. 194 (K.B.), in 1603. *See* LaFave, *Search and Seizure* § 4.8(a) (3rd Ed.1996). And, commencing at least with *Bell v. Clapp*, 10 Johns. R. 263 (N.Y.Sup.Ct.), in 1813, American courts began speaking of the necessity of giving notice in the execution of the search warrant. *See* LaFave, *Search and Seizure* § 4.8(a). This quickly became the generally accepted common law rule in this country, subject to only limited exceptions.

By the mid–1900's, many states had enacted statutes dealing specifically with the authority of an officer to break and enter premises in order to execute a search warrant. Those statutes typically conditioned the right of entry upon the giving of due notice. Congress, in 1948, also passed a statute regulating searches, which authorizes a federal officer to "execute a search warrant, if, after notice of his authority and purpose, he is refused admittance or when necessary to liberate himself or a person aiding him in the execution of the warrant." 18 U.S.C. § 3109. Although often not made explicit in the statutes themselves, the courts generally have construed these provisions as codifications of the common law "knock and announce" doctrine and its common law exceptions. *See* LaFave, *Search and Seizure* § 4.8(a).

The Supreme Court of the United States recently addressed the "knock and announce" doctrine in *Wilson v. Arkansas*, 514 U.S. 927, 115 S.Ct. 1914, 131 L.Ed.2d 976 (1995), wherein, for the first time, the Court held that the common law "knock and announce" doctrine is a part of the Fourth Amendment reasonableness inquiry. *Id.* at 930–31, 115 S.Ct. at 1916.[7]

For a great many years, the Supreme Court of the United States had no occasion to address the "knock and announce" doctrine. When the Court ultimately did address the issue, it was presented in the context of 18 U.S.C. § 3109 (and the similar state statutes) which governed pre-search entry. *See e.g., Miller v. United States*, 357 U.S. 301, 308, 78 S.Ct. 1190, 1195, 2 L.Ed.2d 1332 (1958) (fo-

7. The search of 2222 West Grace Street was conducted pursuant to a search warrant which was issued by a state court and was executed by state officers with no federal involvement. The Supreme Court has indicated that in similar circumstances, the lawfulness of the search is to be judged by state law—that would, in this case, be Virginia law. *See Ker v. California*, 374 U.S. 23, 37, 83 S.Ct. 1623, 1632, 10 L.Ed.2d 726 (1963) (stating, under similar circumstances, that, "[a] fortiori, the lawfulness of these arrests by state officers for state offenses is to be determined by California law"); *see also Miller v. United States*, 357 U.S. 301, 305–06, 78 S.Ct. 1190, 1193–94, 2 L.Ed.2d 1332 (1958). In *Ker*, therefore, the Court evaluated the "no-knock" search under a provision in the California Penal Code which governed the execution of search warrants by state police officers. Similarly, in *Miller*, the Court assessed the validity of a "no-knock" search by reference to the common law of the District of Columbia.

There is some question as to whether the declaration in *Ker* and *Miller* (that state law governs) remains valid after the constitutionalization of the "knock and announce" doctrine effectuated by the Court in *Wilson v. Arkansas*. Indeed, at least where a state statute is inconsistent with the dictates of the Fourth Amendment, it cannot stand after *Wilson*. In Virginia, however, "[t]here is no specific statute relating to 'no knock entry' in executing a search warrant." *Johnson v. Commonwealth*, 213 Va. 102, 189 S.E.2d 678, 679 (1972). Because there is no specific Virginia statute governing no-knock entries in the execution of search warrants, in evaluating such entries, the Supreme Court of Virginia considers only "whether the entry is reasonable within the meaning of the Fourth Amendment to the United States Constitution." *Johnson v. Commonwealth*, 189 S.E.2d at 679; *see also Fenner v. Dawes*, 748 F.Supp. 404, 411 (E.D.Va.1990). The Supreme Court of Virginia also has held that the determination of the reasonableness of a "no-knock" search "is purely a judicial question." *Johnson v. Commonwealth*, 189 S.E.2d at 679. And, the Supreme Court of Virginia looks to federal constitutional law in order to determine the reasonableness of the method of entry preceding a search. *See Id.* at 679–80 (discussing Supreme Court Fourth Amendment jurisprudence and action taken by the Congress of the United States to proscribe "no knock" entries). At a minimum, then, Virginia common law is instructive as to the reasonableness requirements for "no-knock" searches. Therefore, it is appropriate to examine both federal and Virginia law in assessing the legality of the October 11, 1989 search of 2222 West Grace Street.

cusing on the statutory requirement of announcement found in 18 U.S.C. § 3109 rather than any constitutional requirement of reasonableness); *Ker v. State of California,* 374 U.S. 23, 40–41, 83 S.Ct. 1623, 1633–34, 10 L.Ed.2d 726 (1963) (finding that an unannounced entry was reasonable under the "exigent circumstances" of that case, without addressing the antecedent question whether the lack of announcement might render a search unreasonable under other circumstances); *Sabbath v. United States,* 391 U.S. 585, 591 n. 8, 88 S.Ct. 1755, 1759 n. 8, 20 L.Ed.2d 828 (1968) (suggesting that both the "common law" rule of announcement and entry and its "exceptions" were codified in § 3109). In *Miller, Ker,* and *Sabbath,* the Court held that Section 3109 and similar state statute, required police to knock and announce before breaking into a house unless exigent circumstances existed. *Id.*

Finally, in *Wilson v. Arkansas,* the Court made clear that the "knock and announce" rule was constitutionally required by the Fourth Amendment. As the Court explained:

> Our own cases have acknowledged that the common law principle of announcement is embedded in Anglo–American law, but we have never squarely held that this principle is an element of the reasonableness inquiry under the Fourth Amendment. We now so hold. Given the longstanding common-law endorsement of the practice of announcement, we have little doubt that the Framers of the Fourth Amendment thought that the method of an officer's entry into a dwelling was among the factors to be considered in assessing the reasonableness of a search of seizure. Contrary to the decision below, we hold that in some circumstances an officer's unannounced entry into a home might be unreasonable under the Fourth Amendment.

*Id.* at 934, 115 S.Ct. at 1918.

Decisional law reflects that there are four components to the "knock and announce" requirement: (1) knock; (2) identification as law enforcement officer; (3) express the purpose of the officer's presence and the authority for the search or seizure; and (4) wait a reasonable time for occupant to allow or refuse entry. *See Id.* at 930–33, 115 S.Ct. at 1916–17; *Miller v. United States,* 357 U.S. at 309–10, 78 S.Ct. at 1195–96; *Johnson v. Commonwealth,* 189 S.E.2d at 679–680.

> What is generally required is that the officer give appropriate notice of his authority and purpose to the person in apparent control of the premises to be searched. Thus the policemen must identify themselves as police and indicate that they are present for the purpose of executing a search warrant.... Once having given the required notice, the officer must wait a reasonable period of time before he may break and enter into the premises to be searched.

LaFave, *Search and Seizure* § 4.8(a). The "knock and announce" rule is designed to satisfy three purposes: (1) protecting the safety of occupants of a dwelling and the police by reducing violence; (2) preventing the destruction of property; and (3) protecting the privacy of occupants. *See Bonner v. Anderson,* 81 F.3d 472, 475 (4th Cir.1996).[8]

In *Wilson,* however, the Supreme Court of the United States emphasized that the "knock and announce" requirement was not absolute, and that, when confronted with "exigent circumstances," police need not provide advance warning before entering. The Court made clear that there is no "rigid rule of announcement that ignores countervailing law enforcement interests." *Wilson v. Arkansas,* 514 U.S. at 934, 115 S.Ct. at 1918. Rather, an officer's failure to knock and announce his presence is just one element of the Fourth Amendment reasonableness inquiry. *Id.*

Although the Court, in *Wilson,* declined to "attempt a comprehensive catalog of the relevant countervailing factors" that would comprise "exigent circumstances," *Id.,* 514 U.S. at 934, 115 S.Ct. at 1919, it did recognize

---

8. *See also United States v. Bustamante–Gamez,* 488 F.2d 4 (9th Cir.1973) (stating that the "knock and announce" doctrine serves three significant interests: "(1) it reduces the potential for violence to both the police officers and the occupants of the house into which entry is sought; (2) it guards against the needless destruction of private property; and (3) it symbolizes the respect for individual privacy summarized in the adage that 'a man's house is his castle.' ").

three circumstances under which "the presumption in favor of announcement would yield:" (1) circumstances "presenting a threat of physical violence" to the officer; (2) cases presenting a serious risk of flight on the part of the suspect in the dwelling to be searched; and (3) where police have reason to believe that evidence would likely be destroyed if advance notice were given. *Id.* at 934–35, 115 S.Ct. at 1918–19; *see also Ker v. California,* 374 U.S. 23, 39, 83 S.Ct. 1623, 1632, 10 L.Ed.2d 726; *Sabbath v. United States,* 391 U.S. at 591 n. 8, 88 S.Ct. at 1759 n. 8.

The Fourth Circuit, both before and after *Wilson,* has addressed the "knock and announce" doctrine and particularly the "exigent circumstances" exception thereto, and consistently has upheld "no knock" searches where a danger existed to the police officers executing the search warrant. *See, e.g. United States v. Kennedy,* 32 F.3d 876 (4th Cir.1994); *Mensh v. Dyer,* 956 F.2d 36 (4th Cir.1991).[9] The Fourth Circuit also has recognized that "exigent circumstances" exist where announcement would likely result in the destruction of drug evidence or other contraband. *See, e.g. Bonner v. Anderson,* 81 F.3d 472 (4th Cir.1996); *United States v. Kennedy,* 32 F.3d 876 (4th Cir.1994).[10]

The Supreme Court of Virginia likewise has recognized that, where there is probable cause to believe that pre-entry announcement would result in the destruction of evidence or harm to law enforcement personnel, the Fourth Amendment does not require compliance with the "knock and announce" doctrine. The Supreme Court of Virginia first upheld a "no knock" search in *Johnson v. Commonwealth,* 213 Va. 102, 189 S.E.2d 678 (1972), its first explication of the "knock and announce" doctrine. In *Johnson,* the Supreme Court of Virginia held that "no knock" entries are permissible when exigent circumstances exist. *Id.* 189 S.E.2d at 680–

81 (upholding "no knock" entry where the police, at the time of entry, had reliable information that the occupants of the residence were likely to destroy illegal drugs if they knew of police presence) Subsequent to its decision in *Johnson,* the Supreme Court of Virginia consistently has held that the general rule requiring announcement may be waived where the destruction of evidence or harm to law enforcement personnel is likely. *See, e.g. Heaton v. Commonwealth,* 215 Va. 137, 207 S.E.2d 829, 830 (1974) ("Exceptions to the rule, however, permit officers to make an unannounced entry where they have probable cause to believe that their peril would be increased if they announced their presence or that unannounced entry is necessary to prevent persons within from escaping or destroying evidence."); *see also Commonwealth v. Woody,* 13 Va.App. 168, 409 S.E.2d 170 (1991); *Keeter v. Commonwealth,* 222 Va. 134, 278 S.E.2d 841, 846 (1981).

With these principles in mind, the Court will consider Beckford's motion to suppress the evidence seized from 2222 West Grace Street on October 11, 1989.

### 2. The Execution of the Search Warrant for 2222 West Grace Street.

In this case, the Government concedes that the state SWAT unit did not "knock and announce" their presence before entering the dwelling at 2222 West Grace Street. However, the Government asserts that the "no knock" entry was justified by the existence of exigent circumstances. Specifically, the Government argues that, based on the information received from its reliable confidential informant, as set forth in the affidavit in support of the search warrant, the officers had probable cause to suspect forcible resistance from the targets of the search.

Beckford disputes the Government's assertion that "exigent circumstances" existed in the form of a threat of physical violence to

---

**9.** Recent unpublished decisions issued after *Wilson* have adhered to the Fourth Circuit's pre-*Wilson* rules. *See, e.g., United States v. Hawkins,* 99 F.3d 1132, 1996 WL 614790 (unpublished) (4th Cir.1996); *United States v. Barlow,* 86 F.3d 1152, 1996 WL 278754 (unpublished) (4th Cir.1996); *United States v. Allen,* 86 F.3d 1152, 1996 WL 273658 (unpublished) (4th Cir.1996); *United*

*States v. Williams,* 39 F.3d 1179, 1994 WL 589473 (unpublished) (4th Cir.1994).

**10.** *See also United States v. Barlow,* 86 F.3d 1152, 1996 WL 278754 (unpublished) (4th Cir.1996); *United States v. Hawkins,* 99 F.3d 1132, 1996 WL 614790 (unpublished) (4th Cir.1996).

the officers. Beckford's first argument is based principally on what information was not provided to the officers by the informant. Beckford notes that the information provided by the informant, as set forth in the search warrant affidavit, "makes no mention that the informant had ever seen firearms at 2222 W. Grace Street." Memorandum in Support of Beckford's Motion to Suppress at 1. Beckford also claims that "there was no information as to who was at the location at the time of the search, what people were doing at the location at that time, and what danger, if any, was posed to the officers and any innocent bystanders." *Id.* at 3. This argument fails for the simple reason that it ignores the entirety of the information provided by the informant.[11]

The informant, who unquestionably was shown to be reliable, stated that "all the subjects [at 2222 West Grace Street] are well armed with firearms and known to have been involved in numerous shootings. *They have bragged repeatedly that they will not hesitate to shoot anyone.*" Search Warrant, Section 4 (emphasis added). The informant also stated that "the firearms used in the shootings by these subjects are *thought to still be in the possession of them.*" *Id.* (emphasis added). Furthermore, the informant alerted the officers that the occupants of the apartment had told him that they would shoot police officers without hesitation. And, based on police investigations, each subject of the search was thought to be armed with at least one dangerous firearm (including a Glock 17, .25 semi-automatic pistol, and a .38 caliber handgun) which was identified by description by the informant. *See* Operation Early Riser Combined Operations Plan at 1–2.[12]

Moreover, the police were fully aware of the criminal histories of the Poison Clan and of the individual occupants of 2222 West Grace Street. The Operations Plan for the search mission stated: "We have confirmed the group's involvement in several homicides, abductions, firearm violations, narcotics violations. The CI has stated that *the suspects are extremely dangerous and would not hesitate to shoot anyone, including the police.*" *Id.* at 3 (emphasis added). At the time of the search, Beckford, "Country," and "James," each of whom were believed to be inside the apartment, had been indicted by a state grand jury for Malicious Wounding, Use of a Firearm in the Commission of a Felony, and Distribution of Cocaine; the search warrant was issued in relation to these offenses, and in relation to two pending murder investigations. At the time of the search, Beckford himself was a fugitive for the murder of Sherman Ambrose and was wanted for the shooting of Tracy Lavache. And, Tracy Lavache, another subject of the search warrant, was wanted for the murder of Mark Teeter.[13] Thus, the warrant authorized the officers to search for, and they expected to find, "items related to the[se] offenses"—*i.e.* firearms.

On this record, there is no doubt that ample facts were known to the SWAT unit to justify a "no knock" entry. Beckford's claim to the contrary is baseless. The confidential informant provided extensive, specific information about the danger of the occupants of the residence and their use of firearms, all of which is described in the affidavit in support of the search warrant. The SWAT raid plan further identifies the officers' concerns for their safety. Indeed, the officers were so concerned about a possible gun fight with the occupants of the apartment that they took the extreme measure of evacuating the neighbors from their residencies prior to the execution of the search warrant. All of this corroborates the valid concerns of the offi-

---

11. Beckford also overlooks that the lack of knowledge on the part of the officers as to who or what was inside the apartment cuts both ways—facing an unknown number of occupants and firearms may place the executing officers at a greater disadvantage and in significant peril. *See Maryland v. Buie*, 494 U.S. 325, 333, 110 S.Ct. 1093, 1098, 108 L.Ed.2d 276 (1990) ("An ambush in a confined setting of unknown configuration is more to be feared than it is in open, more familiar surroundings.").

12. Indeed, the Operations Plan indicated the precise weapon with which the police believed each occupant of the apartment to be armed.

13. It should be noted that, on the night of the search, Lavache was in the custody of the police still recovering from two bullet shots to the chest. Therefore, the police knew that Lavache was not inside 2222 West Grace Street on the night of the search.

cers for their safety when executing this search warrant; and, so do the items recovered from the search.

■ Beckford's second line of attack is that the assessment of exigency in support of a "no-knock" entry must be made as the situation appears to the officers immediately preceding entry. And, according to Beckford, the assessment of exigency here was too remote in time from the entry to warrant the "no knock" entry.

■ Beckford correctly notes that, under both Virginia and federal law, "police officers may effect ['no knock'] entries based on exigent circumstances *only as they exist at the time of entry*," as opposed to the time when the search warrant was issued. *Fenner v. Dawes*, 748 F.Supp. 404 (E.D.Va.1990) (emphasis added); *see also Ker v. California*, 374 U.S. at 41 n. 12, 83 S.Ct. at 1634 n. 12 ("[I]n determining the lawfulness of entry ... we may concern ourselves only with what the officers had reason to believe at the time of their entry."). Accordingly, although an officer may know of information which would justify a "no-knock" search at one time, the executing officers are responsible for making a threshold reappraisal of the need to execute the search warrant without announcement. *See* LaFave, *Search and Seizure* § 4.8(g).

According to Beckford, the executing officers in this case failed to make that reappraisal, but instead relied solely upon information known at the time the warrant was obtained. Thus, claims Beckford, the assessment of exigency, *and subsequent entry*, were constitutionally infirm. This argument fails for several reasons.

■ First, Beckford would require law enforcement officers to materially discount, or entirely disregard, perfectly valid information obtained in advance of the approach to a residence to be searched. That is neither sensible nor prudent from the perspective of the officers, the neighbors or, indeed, the occupants. Clearly, information can grow stale with the passage of time, but that is not what happened here. In this case, the officers had been reliably informed only 36 hours before entry that the premises was a center for drug trafficking that was used by known and suspected purveyors of violence and death who were known to be armed generally and who had threatened to kill police officers. This case, then, is one in which "the facts which would justify entry without notice are known at the time of application for the warrant." LaFave, *Search and Seizure* § 4.8(a).[14]

Under the rule urged by Beckford, the officers here would have to disregard that information, knock on the door and then identify their purpose to those who would willingly kill them simply because upon approach of the premises to be searched (which was known to house such people) there was no showing of violence or resistance. A rule of that sort would place law enforcement officers, neighbors and passers-by at an unacceptably high, and not constitutionally required, risk.

Second, the rule suggested by Beckford would actually discourage the careful gathering and use of information before entry of the premises to be searched. It takes time to gather information about a place and its occupants. And, it takes time to plan an entry that will reduce risks of danger to occupants, neighbors and law enforcement officers. Where, as here, the information is reasonably current and shown to be reliable, and where there is no evidence of changed circumstances by the time of the entry, it would be folly not to permit reliance on it to plan and execute a search in a way that will minimize the risk of danger in dealing with known violent criminals and that will reduce the risk that those people or the drugs in

---

14. Moreover, the information provided by the confidential informant about the violent character of the targets, the threats they had made and the pervasive use of weapons which were on their persons and stored at the drug-trafficking location, was not of the type which likely would change with the passage of 36 hours. Under the circumstances known to the officers at the time of entry, those conditions would likely be the same as they had been at the time the warrant was issued because the current information about the targets and their violent propensities was consistent with their historical performance over several months. All of those conditions bespoke exigency. To conclude otherwise would have been foolhardy.

**778**

which they were trafficking would disappear.[15] Although the executing officers are responsible for making a threshold reappraisal of the need to execute the search warrant without announcement, that does not require the officers to ignore previously-obtained reliable as to information which there is no reason to doubt its veracity at the time of entry.

Third, Beckford's position ignores settled legal doctrine. The Fourth Circuit consistently has held that probable cause justifying a "no knock" search may be established by knowledge on the part of the executing officers of: (1) threats of future violence by targets of the search, *see United States v. Kennedy*, 32 F.3d at 882–83 (subject told DEA Agent that "if he was arrested for 'something big' in the future, it would be 'killing a cop.' "); (2) the violent criminal history of the targets, *see Id.* (subjects of search had prior convictions involving firearms); *United States v. Hawkins*, 99 F.3d 1132, 1996 WL 614790 at *2 (subject "had previously used violence"); *United States v. Allen*, 86 F.3d 1152, 1996 WL 273658 at *1 (subject had "extensive violent criminal history" including previous convictions for "several robberies, criminal possession of a weapon, assault, resisting arrest, rape, and several drug offenses"); or (3) possession of firearms by the targets, *see United States v. Kennedy*, 32 F.3d at 882–83; (subject known to possess guns); *United States v. Hawkins*, 99 F.3d 1132, 1996 WL 614790 at *2 (same); *United States v. Barlow*, 86 F.3d 1152, 1996 WL 278754 at *1 (several handguns kept close to person of suspect); *United States v. Allen*, 86 F.3d 1152, 1996 WL 273658 at *1 (firearms were recently observed inside the home to be searched). Each of these circumstances was present in this case.

Based on the information at the time of the search, "the officers reasonably inferred that the occupants of [2222 West Grace Street]

would be carrying guns and would attempt to use them against the officers if given the opportunity." *United States v. Kennedy*, 32 F.3d at 883; *see also Wilson v. Arkansas*, 514 U.S. at 934–35, 115 S.Ct. at 1919 (remanding for determination by Arkansas Supreme Court and stating that officer's knowledge that subject of search threatened a government informant with a semiautomatic weapon and that subject was previously convicted of arson and firebombing "may well provide the necessary justification for the unannounced entry in this case"). Nothing in the record suggests that the risks of violence clearly shown when the warrant was obtained had diminished in any way.

The only authority Beckford cites to the contrary is *United States v. Stewart*, 867 F.2d 581 (10th Cir.1989). In *Stewart*, the Tenth Circuit found that exigent circumstances did not exist to justify the forcible entry into the defendant's home without announcement. In that case, there were allegations of drug dealing, and allegations that drug dealers generally carry guns, but no allegations that firearms were on the premises to be searched. In finding that the trial court lacked sufficient facts to justify the unannounced entry, the court indicated that the exigency must be "especially clear" where "there was no knock or warning whatsoever, where there was no information as to who was in the house, where the destruction of physical property took place, and where the occupants of the residence could be injured as a result of the entry." *Id.* at 584.

*Stewart* is unconvincing. First, *Stewart* is clearly distinguishable from the instant case on its facts. In *Stewart*, "[e]ach of the facts outlined in the affidavit supporting the warrant pertained to drug dealers' or 'cocaine and/or controlled substances traffickers' in general. *None of these facts specifically pertained to the defendant or the defendant's*

---

**15.** Indeed, the district court in *Fenner v. Dawes* recognized as much. In *Fenner*, the officers obtained a search warrant two hours before the search was executed. Notwithstanding this passage of time, the court found that the facts known to the officers at the time the warrant was obtained also established exigent circumstances at the time of entry because "the exigent circum-

stances existing at 9:12 p.m. had not changed by the time of entry at 11:00 p.m." 748 F.Supp. at 414.

Similarly, in this case, the exigent circumstances relied upon by the SWAT team had not changed from the time at which the warrant was issued to the time of its execution.

*house." Id.* at 585 (emphasis added). Exactly, the opposite obtained here.

And, in *Stewart,* "[t]he officers were in possession of only two specific facts regarding the defendant that were relevant to the execution of the warrant other than the apparent sales of drugs on two occasions. First, they had been told that the defendant had been seen on one occasion with a pistol.... [S]econd, ... that [the defendant was] of Jamaican descent." *Id.* In this case, however, the police possessed far more specific and extensive information with respect to the individual targets of the search warrant. In this case, the existence of exigent circumstances is "especially clear."

Moreover, the reasoning in *Stewart* evinces a fundamental misunderstanding of the nature of the "exigent circumstances" exception to the "knock and announce" doctrine. In holding that the circumstances surrounding the search warrant were not sufficiently exigent to justify a "no knock" entry, the court, in *Stewart,* stated:

> First of all, the "exigent circumstances" sought to be relied on were matters that were known and that existed at least 24 hours before the warrant was issued. It is difficult to understand how the circumstances were "exigent" when the officers had an entire day to formulate a response to those circumstances. The exigent circumstances exception to 18 U.S.C. § 3109 was developed so as to allow officers to formulate an immediate response to emergency situations that arise on the scene during the execution of a search warrant. In this case, the method of entry used was not formulated in response to an emergency but instead was carefully planned without specific information well in advance of the time the warrant was obtained.

*Id.* at 585. The *Stewart* Court's focus on the time at which information was known to the police is entirely misplaced. Such reasoning is tantamount to a holding that law enforcement officers who thoroughly prepare in advance for a dangerous assignment (*i.e.,* the execution of a search warrant) may never execute a "no knock" search to protect their safety. Not surprisingly, the *Stewart* Court does not suggest what "method of entry," other than an unannounced surprise entry, could possibly be "formulated" by officers executing a search warrant to neutralize the dangers presented by several armed and dangerous suspects who are on their "turf" and are prepared to forcibly resist arrest or the seizure of drugs and money. Officers confronting these situations must be able to rely on the element of surprise, no matter how well prepared in advance they are. For this reason, the relevant inquiry under the "exigent circumstances" exception to the "knock and announce" doctrine consistently has focused on the risks which confront law enforcement personnel in the execution of a particular search warrant, notwithstanding how far in advance the search warrant was issued or whether the officers were · fully prepared for the search.

Moreover, the Fourth Circuit has specifically held in *United States v. Kennedy,* 32 F.3d 876, 882–83 (4th Cir.1994), that an unannounced entry was proper where the officers believed that drug evidence would be destroyed and had reason to fear that the people inside the residence were armed and dangerous. The Court of Appeals emphasized that the "law has uniformly recognized that substantial dealers in narcotics possess firearms and that entrance into a situs of drug trafficking activity carries all too real dangers to law enforcement officers." *Id.* at 882 (*citing United States v. Bonner,* 874 F.2d 822, 824, 827 (D.C.Cir.1989)); *see also United States v. Lalor,* 996 F.2d 1578, 1584 (4th Cir.1993). The particular association between drugs and firearms in this case, as well as the "real dangers to law enforcement officers," are duly noted by this Court.[16]

---

**16.** Although the common connection between drugs and guns is surely one factor to consider in assessing the validity of a "no knock" search, this discussion should not be construed as establishing a blanket exception to the general requirement of "knock and announce" for entries into premises pursuant to a search warrant for evidence of felonious drug activity. The Government in this case has adopted the position set forth by the Wisconsin Supreme Court in *State of Wisconsin v. Richards,* 201 Wis.2d 839, 549 N.W.2d 218 (1996) (holding that a blanket exception to announcement requirement exists for searches pursuant to warrants for evidence of

780

In *Johnson v. Commonwealth*, the Supreme Court of Virginia recognized the risk law enforcement officers face in combating crime in the modern era:

We further believe that the common law should be evaluated in the light of modern technology and the nature of illegal drug traffic in which small, easily disposable quantities of drugs can yield large profits.

It would seem that the perfection of small firearms and the development of indoor plumbing through which evidence can quickly be destroyed have made [statutes requiring notice and entry before the use of force to enter] a dangerous anachronism. In many situations today, a rule requiring officers to forfeit the valuable element of surprise seems senseless and dangerous.

189 S.E.2d at 680 (internal quotations and citations omitted). These concerns are significantly heightened today, nearly twenty-five years after Johnson was decided. *See Maryland v. Buie*, 494 U.S. 325, 333, 110 S.Ct. 1093, 1098, 108 L.Ed.2d 276 (1990) ("The risk of danger in the context of an arrest in the home is as great as, if not greater than, it is in an on-the-street or roadside investigatory encounter.... [A]n in-home arrest puts the officer at the disadvantage of being on his adversary's 'turf.' An ambush in a confined setting of unknown configuration is more to be feared than it is in open, more familiar surroundings.").

While the Court recognizes the essential privacy interests which are safeguarded by the Fourth Amendment and the "knock and announce" doctrine, these concerns must yield to "countervailing law enforcement interests," *Wilson v. Arkansas*, 514 U.S. at 934, 115 S.Ct. at 1918, in the face of exigent circumstances such as those presented in this case. Indeed, here, "law enforcement interests [ ] establish the reasonableness of an unannounced entry." *Id.* at 936, 115 S.Ct. at 1919.

For the reasons set forth above, Dean Beckford's Motion to Suppress Evidence of

Search of 2222 West Grace Street is DENIED.

The Clerk is directed to send a copy of this Memorandum Opinion to all counsel of record.

It is so ORDERED.

drug activity), *cert. granted, sub nom. Richards v. Wisconsin*, —— U.S. ——, 117 S.Ct. 679, 136 L.Ed.2d 604 (1997). The Supreme Court has granted certiorari to consider this precise issue. *See Id.*