**Mark MARTIN, Plaintiff,**

v.

**CITY OF OCEANSIDE, Shawn Kelly, Benjamin Ekeland, and Does 1–20, Defendants.**

**No. Civ. 00CV1932BNLS.**

United States District Court, S.D. California.

June 7, 2002.

James E. Dunn, San Diego, CA, for Plaintiff.

Pamela J. Walls, Oceanside City Atty's Office, Oceanside, CA, for Defendants.

**ORDER DENYING MOTION FOR SUMMARY JUDGMENT [Docket No. 9–1], GRANTING MOTION FOR SUMMARY ADJUDICATION [Docket No. 9–2], DENYING DEFENDANTS' OBJECTIONS [Docket No. 21–1], DENYING AS MOOT PLAINTIFF'S MOTION TO CONTINUE HEARING [Docket Nos. 24–1 and 24–2] AND DISMISSING STATE LAW CLAIMS**

BREWSTER, Senior District Judge.

## I. INTRODUCTION

Before the Court are Defendants' Motion for Summary Judgment, or in the Alternative, Summary Adjudication of Issues, Defendants' Objections to Plaintiff's Opposition, and Plaintiff's Motion to Continue Hearing. The Court determined it appropriate to decide these matters without oral argument as permitted by Civil Local Rule 7.1(d)(1). For the reasons below, the Court denies Defendants' Objections to this Court's consideration of plaintiff's late-filed opposition brief, denies Plaintiff's motion to continue hearing, grants Defendants' Motion for Summary Adjudication of Issues as to the federal claims, and dismisses without prejudice the remaining pendent state law claims.

## II. BACKGROUND

Mark Martin is suing the City of Oceanside and police officers Shawn Kelly and Benjamin Ekeland for claims rising out of an incident in which Officers Kelly and Ekeland entered Martin's house without a warrant and pointed loaded guns at him. Martin's complaint asserts two federal claims and four state common law claims: (1) a 42 U.S.C. § 1983 claim against the police officers for alleged violation of Martin's Fourth Amendment rights; (2) a 42 U.S.C. § 1983 claim against the City for unlawful policies, customs, or habits; (3) trespass; (4) false imprisonment; (5) intentional infliction of emotional distress; and (6) negligence.

At about 4:30 p.m. on December 28, 1999, Officer Shawn Kelly was dispatched to Martin's residence to "check the welfare" of Martin's roommate, Traci Trotman. Ms. Trotman's father, Dr. Ronald Trotman had called the Oceanside Police Department from Portland, Oregon urging that the police check on Ms. Trotman because he had been unable to reach her by phone for several days and was "extremely concerned and felt she could be in trouble." Defs.' Mem.P. & A.Supp.Summ.J. at 1; Dec. Dr. Ronald Trotman ¶ 2.

Officer Kelly went to Martin's home at 4904 Amador in Oceanside. He noticed Ms. Trotman's car parked outside (Trotman's father had given the police a description of her car). Officer Kelly knocked on the door and rang the doorbell at 4904 Amador, but no one answered.

In fact, both Martin and Trotman were inside the house. Although Martin saw a uniformed police officer at the door, he did not answer the door because he "assumed" his "ex-wife had called the police and made a false accusation." Dec. Martin ¶ 9.

While Officer Kelly knocked at the door, Martin "called [his] lawyer in [his] divorce case and asked him if [he] had to respond to this intrusion." *Id.*

When no one answered the door, Officer Kelly had dispatch call Trotman's phone number; dispatch did so and the line was answered by Trotman's answering machine. Defs.' Mem.P. & A.Supp.Summ.J. at 1. Officer Kelly then walked around the house to a side door (according to plaintiff, he got there by opening a latched gate and walking through the side yard). Defs.' Mem.P. & A.Supp.Summ.J. at 1.; Pl.'s Mem.P. & A.Opp. at 2. The side door was unlocked (defendants' word is "unsecured") but closed. Pl.'s Mem.P. & A.Opp. at 2. Officer Kelly opened it and entered plaintiff's garage. Kelly asserts that he entered after "identif[ying] himself with the Oceanside Police;" plaintiff disputes that Kelly announced his entry. Kelly Dec. ¶ 5. Pl.'s Mem.P. & A.Opp. at 2.

Inside the garage, Officer Kelly found and tried an unlocked door that led into the main house. "Fearing that a crime could be in progress," Officer Kelly exited the garage and requested an additional police unit. Kelly Dec. ¶ 5.

Officer Kelly then talked to the next door neighbor, who told Kelly that she had seen a female at the residence on Christmas day and a male at the residence the day before, that the occupants' cars were in the driveway, and that they should be home. Kelly Dec. ¶ 6. Officer Kelly "went back to the front door and started banging loudly on the door and pushing the door bell repeatedly. This went on for several minutes. There was no answer." *Id.* ¶ 7.

Officer Benjamin Ekeland arrived as the backup unit Officer Kelly had requested. Officer Kelly "explained the situation to him." Kelly Dec. ¶ 8. Both officers went back to the unlocked side door. The officers claim they "loudly identified [them-]selves as 'Oceanside Police.'" Martin claims they did not identify themselves at all. However, Martin by then was watching from Ms. Trotman's upstairs bedroom window "and could see . . . that defendant Kelly was wearing a police uniform." Pl.'s Mem.P. & A.Opp. at 3.

The officers entered the main house through the unlocked door in the garage. They entered "with their guns drawn for their own safety and that of the occupants." Defs.' Mem.P. & A.Supp.Summ.J. at 2. Using flashlights so they could see (it was dark outside by this time); the officers checked the downstairs area for people but found no one. They then started up the staircase to the second floor.

Meanwhile, Martin and Trotman were still in Trotman's bedroom. Martin had started his camcorder to videotape the officers. At the direction of Martin, Trotman came out of the bedroom to see what the officers wanted. The officers told her not to move and to identify herself. Martin then came out of the bedroom and stood next to Trotman. The officers, who were standing about 15 to 20 feet away, pointed their guns at Martin and Trotman. Martin Dec. ¶ 17. Trotman identified herself, and the officers holstered their guns. Defs.' Mem.P. & A.Supp.Summ.J. at 3. About four minutes elapsed from the time the officers entered the house and the time they notified dispatch that they were okay. *Id.*

## III. STANDARD OF LAW

### A. Motion for Summary Judgment

Federal Rule of Civil Procedure 56(c) provides that summary judgment is appropriate if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." In considering a motion for summary judgment, the court must examine

all the evidence in the light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

Summary judgment must be granted if the party responding to the motion fails "to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The evidence offered need not be in a form admissible at trial to avoid summary judgment. *Id.* at 324, 106 S.Ct. 2548. When the moving party does not bear the burden of proof, summary judgment is warranted by demonstration of an absence of facts to support the non-moving party's case. *Id.* at 325, 106 S.Ct. 2548.

The Court must determine whether evidence has been presented that would enable a reasonable jury to find for the non-moving party. *Liberty Lobby, Inc.*, 477 U.S. at 249–252, 106 S.Ct. 2505. If the Court finds that no reasonable fact-finder could, considering the evidence presented by the non-moving party and the inferences therefrom, find in favor of that party, summary judgment is warranted.

If the Court is unable to render summary judgment upon an entire case and finds that a trial is necessary, it shall, if practicable, grant summary adjudication for any issues as to which standing alone, summary judgment would be appropriate. *See* Fed.R.Civ.P. 56(d); *see also California v. Campbell*, 138 F.3d 772, 780 (9th Cir. 1998), *cert. denied* (Oct. 5, 1998).

**B. § 1983 Claim Asserting Fourth Amendment Violations Due to Unlawful Search, Unlawful Seizure, or Excessive Force—Qualified Immunity**

A private right of action exists against persons who, acting under color of state law, violate a citizen's federal constitutional or statutory rights. 42 U.S.C. § 1983. The defense of qualified immunity, however, protects certain § 1983 defendants from the burden of litigation. A court presented with the issue must determine whether police officers sued under § 1993 have a valid qualified immunity defense before proceeding to the merits of the § 1983 claim because "[q]ualified immunity is 'an entitlement not to stand trial or face the other burdens of litigation.'" *Saucier v. Katz*, 533 U.S. 194, 200, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001), *quoting Mitchell v. Forsyth*, 472 U.S. 511, 526, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985).

Under the Supreme Court's recently established test, the determination whether police officers are qualifiedly immune is based on two questions. First, "[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" *Saucier*, 533 U.S. at 201, 121 S.Ct. 2151. If the answer to the first question is "no," then the officers have qualified immunity. *Id.*

Precisely what information a court should review when attempting to answer this first question is an issue not directly addressed by the *Saucier* Court, nor by the Ninth Circuit in interpreting *Saucier*. Indeed, as far as this Court is aware, no court applying the *Saucier* test has explicitly stated what the Supreme Court meant when it held that trial courts must decide whether "the facts alleged" show violation of a constitutional right.

Though they have not addressed the point explicitly, courts nevertheless seem to have come to different conclusions about what the Supreme Court meant by "the facts alleged." In one case, for example, the Ninth Circuit "[a]ssum[ed] [plaintiff's] version of the facts is correct" without specifying whether it was reviewing the facts alleged in plaintiff's complaint or the facts established by plaintiff's summary

judgment affidavits. *See Jackson v. City of Bremerton,* 268 F.3d 646, 652 (9th Cir. 2001). In another case, the Ninth Circuit first stated that it reviews *"the facts* taken in the light most favorable to the plaintiff" but then stated it "conclude[d] that the plaintiff has *alleged* a [constitutional] violation." *See Robinson v. Solano County,* 278 F.3d 1007, 1013 (9th Cir.2002) (emphasis added).

Other circuits' opinions are no more helpful in resolving the issue. In one case, the Third Circuit appears to have reviewed only the *plaintiffs'* summary judgment submissions in answering the first *Saucier* question. *See Bennett v. Murphy,* 274 F.3d 133, 136 (3d Cir.2002). The Fourth Circuit has considered the "uncontradicted evidence" submitted by *both parties* in their summary judgment briefs to determine whether a constitutional violation occurred. *See Clem v. Corbeau,* 284 F.3d 543, 550–51 (4th Cir.2002). And the Eleventh Circuit has determined whether a constitutional right would have been violated "under the *plaintiff's* version of the facts." *See Lee v. Ferraro,* 284 F.3d 1188, 1194 (11th Cir.2002) (emphasis in original).

■ Because the circuits have come to different conclusions, this Court is left to make its own determination of what the Supreme Court meant when it said a court should review "the facts alleged" to determine whether plaintiff has established a violation of a constitutional right. To this Court, the phrase "the facts alleged" means the facts alleged in plaintiff's complaint that form the basis of the plaintiff's § 1983 claims. *See Black's Law Dictionary,* 68 (5th ed.1979) (defining "allega-

tion" as "[t]he assertion, claim, declaration, or statement of a party to an action, made in a pleading, setting out what he expects to prove"). This conclusion adheres most closely to the precise legal meaning of "the facts alleged." It also is the interpretation that allows the first *Saucier* question— whether a constitutional right was violated—to remain as distinguishable as possible from the merits of plaintiff's § 1983 claim. That the analysis of defendants' qualified immunity defense is not duplicative of the analysis of the merits of plaintiff's § 1983 claim is a theme the *Saucier* Court emphasized more than once. *See, e.g., Saucier,* 533 U.S. at 203, 205, 121 S.Ct. 2151 ("In *Anderson, . . .* we rejected the argument that there is no distinction between the reasonableness standard for warrantless searches and the qualified immunity inquiry;" "[t]he qualified immunity inquiry . . . has a further dimension [from the merits of plaintiff's constitutional claim]"). Finally, determining the answer to the first *Saucier* question by reviewing the factual allegations in plaintiff's complaint presents the least restrictive barrier to a plaintiff suing for deprivation of federal rights. For all these reasons, this Court finds that in answering the first qualified immunity inquiry under *Saucier,* a court should review the facts alleged in plaintiff's complaint to determine whether plaintiff has asserted a constitutional violation.

As stated above, if a court finds that plaintiff has failed to assert a constitutional violation, the inquiry is over and the officer is entitled to qualified immunity. *Saucier,* 533 U.S. at 201, 121 S.Ct. 2151.[1] However, if the answer to the first ques-

---

1. *Saucier* does not explicitly say that a negative reply to the first question results in a finding of qualified immunity. It states, "[i]f no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity." *Saucier,* 533 U.S. at 201, 121 S.Ct. 2151. One could argue that a negative answer to the first question terminates that entire cause of action as to all defendants for failure to state a cause of action. This Court interprets the Court's meaning only to establish the qualified immunity of

tion is "yes," the court must ask a second question: "whether the officer could nevertheless have reasonably but mistakenly believed that his or her conduct did not violate a clearly established constitutional right." *Jackson*, 268 F.3d at 651.

 In answering this question, a court is not restricted to the allegations of plaintiff's complaint. Instead, because it is looking at events from the point of view of a reasonable police officer, a court addressing the second qualified immunity inquiry must necessarily refer to the evidence submitted by all parties. The court must review the evidence and determine whether the constitutional right allegedly violated was clearly established, and whether the officer could have reasonably but mistakenly believed his conduct did not violate that right. *See Robinson*, 278 F.3d at 1015–1016 (" 'If the law did not put the officer[s] on notice that [their] conduct would be unlawful, summary judgment based on qualified immunity is appropriate.' "), *quoting Saucier*, 533 U.S. at 202, 121 S.Ct. 2151.

### C. Unlawful Policies, Customs, or Habits Claim Against a City Under § 1983

 A municipality may be held liable under § 1983 "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury...." *Monell v. Dep't of Social Servs.*, 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Furthermore, if police officers' conduct was unconstitutional, and if it was based on a city's official policy, the city can be held liable for violation of the plaintiff's constitutional rights. *Id.* Additionally, if a police officer is given qualified immunity on grounds that he acted unconstitutionally, but he reasonably believed he was not

violating a clearly established right, the City can still be held liable for creating the policy that caused the officer's unconstitutional conduct.

However, if a court finds that the officer did not, in fact, violate plaintiff's constitutional rights, the plaintiff's claim against the city fails because "[n]either a municipality nor a supervisor ... can be held liable under § 1983 where no injury or constitutional violation has occurred." *Jackson*, 268 F.3d at 653, *citing City of Los Angeles v. Heller*, 475 U.S. 796, 799, 106 S.Ct. 1571, 89 L.Ed.2d 806 (1986). Therefore, if a court finds that the defendant police officers acted constitutionally, any § 1983 claims against a city based on the officers' conduct also fail.

## IV. ANALYSIS

As a preliminary matter, defendants have objected to the Court's consideration of plaintiff's opposition brief because it was untimely filed in violation of a stipulated briefing schedule approved by the Court. The Court has considered defendants' objection and exercises its discretion to consider plaintiff's opposition brief, although it was untimely filed. Defendants' objection is therefore denied. The Court additionally notes that plaintiff filed several other documents and a video tape on the Friday before the hearing for this motion was scheduled in violation of the time limits set forth in Civil Local Rule 7.1(e). The Court has exercised its discretion to accept those documents and video tape and has reviewed them as well. Plaintiff's Motion to Continue Hearing is therefore denied as moot.

### A. Claim for Violation of 42 U.S.C. § 1983 Against Police Officers Kelly and Ekeland

Plaintiff alleges that defendants violated his Fourth Amendment rights in three

---

the officers whose conduct was the subject of the allegations.

ways: first, by entering his house without a warrant or consent; second, by failing to knock and announce their presence as they entered; and third, by pointing their guns at him in the hallway of his house. Defendants argue that they are entitled to qualified immunity from liability for plaintiff's § 1983 claims. They contend that Officers Kelly and Ekeland's entry into plaintiff's house was justified under the "community caretaking" exception[2] to the warrant requirement. Defs.' Mem.P. & A.Supp. Summ.J. at 4, citing *People v. Ray,* 21 Cal.4th 464, 88 Cal.Rptr.2d 1, 981 P.2d 928 (1999). Defendants also argue that mere pointing of guns does not constitute excessive force under the Fourth Amendment, and further, that the show of force was necessary for the officers' security and the safety of the occupants in the house. *Id.* at 6–8.

To determine whether Officers Kelly and Ekeland are shielded by qualified immunity, this Court must first ask whether, taken in the light most favorable to the party asserting the injury, the facts alleged in plaintiff's complaint show the officers' conduct violated a constitutional right. *Saucier,* 533 U.S. at 201, 121 S.Ct. 2151. Below, the Court finds that the answer to the first *Saucier* question is "yes" as to plaintiff's allegations of warrantless entry, failure to knock and announce, and excessive force state claims against the officers for Fourth Amendment violations. However, the Court answers "yes" to the second *Saucier* question, that

is, whether the officer could nevertheless have reasonably but mistakenly believed that his or her conduct did not violate a clearly established constitutional right, because the officers acted reasonably under the circumstances. Therefore, the officers are entitled to qualified immunity.

### 1. Warrantless entry into Plaintiff's home

Plaintiff's complaint alleges that Officers Ekeland and Kelly entered his home without a warrant, without his consent, and under nonexigent circumstances. Compl. at ¶¶ 8–14. These allegations of warrantless entry into plaintiff's home, unjustified (according to plaintiff) by any exception to the warrant requirement, state a *prima facie* claim for violation of plaintiff's Fourth Amendment rights. Therefore, plaintiff overcomes the first qualified immunity hurdle.

 However, in answering the second qualified immunity question, the Court considers the plaintiff's and the officers' version of events, as established by their summary judgment papers, rather than merely the factual allegations in plaintiff's complaint. Here, the undisputed evidence shows that the officers' warrantless entry was justified by the "emergency aid" exception[3] to the Fourth Amendment's warrant requirement. Therefore, the answer to the second *Saucier* question is "yes" because they reasonably (and correctly) believed they were acting in accordance

---

**2.** The "community caretaking" exception, described by the California Supreme Court in *People v. Ray,* 21 Cal.4th 464, 88 Cal.Rptr.2d 1, 981 P.2d 928 (1999), purports to expand on the "emergency aid" exception to the warrant requirement. Under the emergency aid exception, which is accepted by the Ninth Circuit, an officer may enter a dwelling to give emergency assistance to a person whom they reasonably believe to be in distress. *See, e. g., United States v. Cervantes,* 219 F.3d 882, 889 (9th Cir.2000). The community caretaking

exception described in *People v. Ray* encompasses the emergency aid exception as well as officers' warrantless entry into a home if they have articulable suspicion that a burglary is taking place or has taken place. *Ray,* 21 Cal.4th at 471–474, 88 Cal.Rptr.2d 1, 981 P.2d 928.

**3.** As stated above in footnote 2, the "community caretaking" exception relied on by Defendants encompasses the "emergency aid" exception.

with an exception to the Fourth Amendment's warrant requirement.

The "emergency aid" exception permits an officer's warrantless entry into a home "in their community caretaking function to respond to emergency situations." *United States v. Cervantes,* 219 F.3d 882, 889 (9th Cir.2000). There are three requirements for meeting the emergency aid exception: (1) the police had " 'reasonable grounds to believe that there is an emergency at hand and an immediate need for their assistance for the protection of life or property;' " (2) the "search must not be primarily motivated by intent to arrest and seize evidence;" and (3) there was a " 'reasonable basis, approximating probable cause, to associate the emergency with the area or place to be searched.' " *Cervantes,* 219 F.3d at 889–890, *quoting People v. Mitchell,* 39 N.Y.2d 173, 383 N.Y.S.2d 246, 347 N.E.2d 607 (1976).

Here, all three prongs are met, and the emergency aid exception therefore applies. First, the undisputed evidence shows that Officers Kelly and Ekeland had reasonable grounds to believe that there was an emergency at hand. The officers were informed that Martin's and Trotman's cars were in front of the house, and that they should have been home. But no one answered the door in response to the officers' repeated knocking, and Trotman did not answer her phone when dispatch called. The circumstances were consistent with Dr. Trotman's statement to the police that he was urgently concerned for the welfare of his daughter, and suggested that she may, in fact, have been in trouble inside the house.

Second, the officers' search was not motivated by intent to arrest or to seize evidence. The officers' actions, sweeping the first floor of the house for people, and then going upstairs to search for occupants, were entirely consistent with their claim that they were searching for Trotman and

were concerned for her welfare. Nor does plaintiff provide any evidence that contradicts this conclusion.

Third, the police had a reasonable basis for searching the house to find Trotman. The neighbor said Trotman's and Martin's cars were parked outside the home, and that both occupants should be there. Moreover, the neighbor appeared to be familiar with Trotman and Martin, saying she had seen them at home a few days before, and thus provided the police with reason to believe they could rely on her expectation that Trotman and Martin were at home. It was therefore reasonable of the police to search Martin's house to find Trotman.

In sum, the officers' entry into Martin's home was justified by the emergency aid exception to the Fourth Amendment's warrant requirement. Therefore, the officers are entitled to qualified immunity as to this claim.

**2. Failure to "knock and announce"**

Next, plaintiff argues that the officers acted unreasonably in violation of the Fourth Amendment by violating the "knock and announce" rule. Plaintiff's complaint states that he "heard loud knocking at his front door," but that the officers "failed to identify themselves as police officers;" that he "chose not to answer the door," and that twenty minutes later, the officers appeared in his upstairs hallway. Compl. ¶¶ 8, 9. Essentially, according to plaintiff's allegations, the officers knocked and waited to enter, but they failed to announce their identity as police officers or the purpose of their presence.

The Court first finds that plaintiff's complaint, construed liberally, does set forth a claim for a Fourth Amendment violation. "[I]n some circumstances an officer's unannounced entry into a home might be unreasonable under the Fourth Amend-

ment." *Wilson v. Arkansas,* 514 U.S. 927, 934, 115 S.Ct. 1914, 131 L.Ed.2d 976 (1995). While the knock and announce rule has generally been applied only to execution of a warrant, *Wilson* does not limit the rule to that circumstance. Therefore, it is conceivable that for officers' entry into a home pursuant to the emergency aid exception to be constitutional, the officers must comply with the knock and announce rule. For purposes of this claim, the Court assumes that officers are not excused from knocking and announcing simply because they are entering a house for some reason other than to execute a warrant.

The knock and announce rule itself has been held to contain four components: "(1) knock; (2) identification as law enforcement officer; (3) express the purpose of the officer's presence and the authority for the search or seizure; and (4) wait a reasonable time for occupant to allow or refuse entry." *United States v. Beckford,* 962 F.Supp. 767, 774 (E.D.Va.1997). Failure to fulfill all components of the knock and announce rule can, in some circumstances, amount to insufficient notice by the officers and thereby render a search unconstitutional. *See, e.g., United States v. Rodriguez,* 663 F.Supp. 585 (D.D.C. 1987) (failure to wait reasonable time for refusal constituted violation of 18 U.S.C. § 3109, which codifies knock and announce rule).

■ However, ultimately, the failure—or partial failure—to knock and announce does not make a search automatically unreasonable under the Fourth Amendment. "[L]aw enforcement interests may also establish the reasonableness of an unannounced entry." *Wilson,* 514 U.S. at 936, 115 S.Ct. 1914. For example, the officer's reasonable belief that a mild exigency existed has been declared sufficient to justify total failure to knock and announce. *United States v. Hudson,* 100 F.3d 1409,

1417 (9th Cir.1996) (finding mild exigency of " 'likelihood' that the occupants would 'try to escape, resist, or destroy evidence' " justified failure to await refusal before entering and executing warrant, in violation of 18 U.S.C. § 3109). Ultimately, whether failure to knock and announce renders a search unreasonable is a decision to be made by the district court on a case-by-case basis. *See Wilson,* 514 U.S. at 936, 115 S.Ct. 1914 ("... we leave to the lower courts the task of determining the circumstances under which an unannounced entry is reasonable under the Fourth Amendment.").

As one would expect, plaintiff's complaint does not give any justification for the officers' allegedly unannounced entry. Instead, as described above, it merely states that the officers knocked and waited to enter, but they failed to announce their identity as police officers or the purpose of their presence. Though these alleged facts certainly do not amount to an egregious violation, the complaint does state a claim for unconstitutional conduct by the officers. Therefore, the answer to the first *Saucier* question as to this claim is "yes."

■ However, the Court finds that the officers are entitled to qualified immunity because their conduct did not violate a clearly established right of plaintiff's. Failure to knock and announce is but a factor that goes to the reasonableness of an officer's search of a home. *Wilson,* 514 U.S. at 931, 115 S.Ct. 1914. Knocking and announcing is not an element of a constitutional search the failure of which makes a search of a home *per se* unreasonable. Instead, the reasonableness of the search is determined by looking at the totality of the circumstances presented to the officers, and balancing the occupant's privacy interests and interests in being informed about the officers' impending entry against

the government's interests in entering without knocking or announcing.

Ultimately, looking at the four knock and announce components individually, what we have in this case is a situation where (1) it is undisputed that the police *did* knock and ring the doorbell; (2) it is *disputed* whether the officers announced their presence;[4] (3) it is undisputed that the officers *did not* announce the express purpose of their presence; and (4) is undisputed that the officers *did* wait for twenty minutes—more than a reasonable amount of time—before entering. *See Beckford,* 962 F.Supp. at 774, *and see United States v. Spikes,* 158 F.3d 913, 926 (6th Cir.1998) (fifteen to twenty seconds a constitutionally reasonable amount of time to wait before entering). Thus, the Court must consider whether the officers' partial noncompliance with the knock and announce rule—their failure to announce their presence and express their purpose—renders their search of plaintiff's house constitutionally unreasonable.

Here, the officers' search of the house was reasonable in spite of their alleged failure to announce their identity and admitted failure to reveal their purpose. First, the officers substantially complied with the knock and announce rule. The officers did knock and ring the plaintiff's doorbell for several minutes. The police department attempted to phone Traci Trotman to let her know they were trying to locate her. And the officers waited a substantial amount of time before entering plaintiff's home. Thus, at the very least the first and fourth factors were satisfied more than adequately, and the phone call to Trotman's answering machine was at least an attempt by others at the police department to announce their general pur-

pose of locating her, which attempt might arguably satisfy the third knock and announce component. Finally, plaintiff admits he could see from his upstairs window that the person knocking and ringing his doorbell was a police officer, making the announcement of the officers' identity almost a non-issue.

Second, any failure on the part of the officers to fully comply with the knock and announce rule was justified by the emergency aid exception and the mild exigency created by the apparent danger of the situation. The Court has already concluded that the officers' entry into plaintiff's home was justified by the emergency aid exception to the warrant requirement. The officers had reason to believe that the circumstances indicated that someone in the house may have been in danger, and they also had reason to believe that there were occupants in the house who refused to answer the door. Balancing the government's interest in ensuring the safety of what the officers believed was a potential victim in the house against plaintiff's interest in having the officers identify themselves as police officers without his having to reveal his presence in the house, the Court concludes officers' conduct was reasonable. Moreover, given the mild exigency created by the officers' belief that there were occupants in the house who passively objected to their presence by ignoring the officers' knocking and ringing the doorbell, the officers' alleged failure to announce their purpose was justified. *See Hudson,* 100 F.3d at 1417 (mild exigency justified officers' failure to await refusal before entering and executing warrant).

Therefore, the officers did not violate a clearly established right of plaintiff's. The

---

4. This factual dispute is not material to the Court's resolution of this claim, because even assuming that the officers failed to announce their identity, the Court still finds, for the reasons given below, that their search of the house was reasonable under the Fourth Amendment.

officers are entitled to qualified immunity as to this claim.

### 3. Pointing guns at Martin

Finally, plaintiff claims that the officers' pointing their guns at Martin constituted excessive force under the Fourth Amendment. Again, the Court first has to determine whether plaintiff's complaint alleges facts which, if true, would amount to a constitutional violation by the officers. Plaintiff's complaint alleges that Officers Kelly and Ekeland entered his house without his knowledge or consent, and that "Plaintiff was confronted in the hallway by Defendant Police Officers KELLY and EKELAND with their guns drawn, pointing them threateningly at plaintiff and his roommate." Compl. ¶ 9. The complaint further alleges that "Plaintiff had committed no crime and was suspected of none. There was no reason for the Defendants to be threatening him with their guns." *Id.* ¶ 10.

■ The allegations in plaintiffs complaint state a claim for excessive force. The basic test for excessive force is whether the officers used force that was not objectively reasonable under the circumstances with which the officer was presented. *Robinson*, 278 F.3d at 1013. In assessing whether a police officer has used excessive force, courts consider whether "factors justifying the use of force were present." *Id.* at 1014. These factors include " 'the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.' " *Id.* at 1013–14, *quoting Graham v. Connor*, 490 U.S. 386, 397, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989).

Here, plaintiff's complaint avers that the officers pointed guns at plaintiff. The Ninth Circuit has held that mere pointing of guns may constitute unconstitutionally excessive conduct. *Robinson*, 278 F.3d at 1014. Moreover, the complaint states that there was no justification for the officers' use of force: plaintiff was not the suspect of a crime, nor (according to plaintiff) was there any other reason justifying the officers' use of force. Based on these allegations, the Court finds that plaintiff's complaint states a claim for excessive force by the officers.

■ However, proceeding to the second qualified immunity question, the Court finds that a review of both parties' submissions makes it clear that, based on the undisputed facts, the officers' use of force was objectively reasonable under the circumstances; therefore, their conduct did not violate a clearly established constitutional right. As stated above, the determination whether a show of force was excessive requires a court to balance the nature of the intrusion against the government interests at stake. *Jackson*, 268 F.3d at 652. In assessing whether an officer's use of force violated the Fourth Amendment, courts are counseled to " 'allow[ ] for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.' " *Id.* at 651, *quoting Graham v. Connor*, 490 U.S. 386, 396–97, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). Relevant to an officer's decision to use force is whether "dangerous or exigent circumstances" existed that made it objectively reasonable for the officer to conclude that some show of force was necessary. *Robinson*, 278 F.3d at 1014.

Here, the undisputed facts are that the officers had entered the house to check on Traci Trotman's welfare. They were walking through a dark house with the use of flashlights. The facts at hand—for example, the neighbor's statement that the oc-

cupants should be in the house, and the fact that Martin's and Trotman's cars were parked outside—reasonably caused the officers to suspect there were people in the house. The occupants' refusal to answer the door would have caused a reasonable police officer to conclude there might be some resistance to their entry. Under the circumstances, which here were clearly "tense, uncertain, and rapidly evolving," the officers' split-second choice to point guns when they came upon a woman and man upstairs was not unreasonable. Moreover, as soon as the officers realized that the woman was Trotman, and that there was no danger, they holstered their guns.

Under the circumstances, the officers' pointing guns at Martin was reasonable and did not violate the Fourth Amendment's prohibition against excessive force. Therefore, the officers are entitled to qualified immunity as to plaintiff's excessive force claim.

### 4. Summary: Qualified Immunity Defense

Having analyzed the second inquiry of *Saucier* regarding defendant officers' qualified immunity defense, whether officers reasonably believed their conduct did not violate any clearly established constitutional right of the plaintiff, the Court finds the answer to be "yes" as to all three of plaintiff's theories of Fourth Amendment violations. This is so because looking at the undisputed facts from both parties' summary judgment papers, it is clear that the officers' conduct did not violate the Fourth Amendment rights of plaintiff at all. Officers Ekeland and Kelly are thus entitled to dismissal of the first claim of plaintiff's complaint (§ 1983 cause of action) based on their qualified immunity.

### B. Claim for Violation of 42 U.S.C. § 1983 Against the City

Plaintiff's second cause of action states a claim against the City of Oceanside for establishing the policies that caused the officers' conduct. Compl. ¶¶ 21–23. Such *Monell* claims against municipalities impose liability on the city where its policies caused the officers' illegal conduct. However, such claims cannot succeed unless there was unconstitutional conduct on the part of the officers. *See Monell*, 436 U.S. at 691, 98 S.Ct. 2018 (". . . Congress did not intend municipalities to be held liable unless action pursuant to official municipal policy of some nature caused a constitutional tort"); *see also Jackson*, 268 F.3d at 653 ("Neither a municipality nor a supervisor, however, can be held liable under § 1983 where no injury or constitutional violation has occurred"), *citing City of Los Angeles v. Heller*, 475 U.S. 796, 799, 106 S.Ct. 1571, 89 L.Ed.2d 806 (1986). If a court finds the officers acted constitutionally, the city has no liability under § 1983.

Here, the Court has already concluded that the officers' conduct was not unconstitutional. It is true that the Court has answered the first *Saucier* question, whether plaintiff alleges facts that show a constitutional violation by the officers, in the affirmative. However, it is equally clear from the Court's analysis above that in answering the second *Saucier* question, in the course of which the Court is permitted to review both parties' summary judgment papers, rather than just plaintiff's complaint, the Court has determined that the uncontradicted facts show the officers did not violate plaintiff's constitutional rights. First, the Court has determined that the officers' entry into plaintiff's home was justified by the "emergency aid" exception to the Fourth Amendment's warrant requirement. Second, the Court has found that the officers' alleged failure to

announce their presence and purpose, even if true, did not make their search of plaintiff's home unreasonable under the Fourth Amendment. Third, the Court has determined that the officers' pointing guns at plaintiff did not constitute excessive force under the circumstances.

Therefore, because the officers' conduct did not violate plaintiff's constitutional rights, there is no unconstitutional action which can be charged against the City, and plaintiff's *Monell* claim against the City fails.

### C. Remaining State Law Claims

All that remain in this case, once plaintiff's claims for violation of 42 U.S.C. § 1983 are dismissed, are four state law tort claims. Under 28 U.S.C. § 1367(c)(3), a district court "may decline to exercise supplemental jurisdiction over a claim . . . if . . . the district court has dismissed all claims over which it has original jurisdiction." The Court, having dismissed plaintiff's federal claims, declines to exercise supplemental jurisdiction over the remaining state law claims. *See, e.g., Reed v. Iranon,* 940 F.Supp. 1523, 1531–32 (D.Hawai'i 1996) (declining, under 18 U.S.C. § 1367(c)(3), to exercise supplemental jurisdiction over state claims after dismissing claim under 42 U.S.C. § 1983). The state claims are accordingly dismissed without prejudice.

### V. CONCLUSION

For the reasons stated above, the Court hereby DENIES Defendants' Objections to Plaintiff's Opposition and DENIES as moot Plaintiff's Motion to Continue Hearing and Allow for Litigation on the Merits. The Court DENIES Defendants' Motion for Summary Judgment as to all Plaintiff's claims. The Court GRANTS Defendants' Motion for Summary Adjudication as to Plaintiff's claims against Defendants for violation of 42 U.S.C. § 1983. The § 1983 claims are accordingly DISMISSED with

prejudice. Plaintiff's remaining claims under state law for unlawful entry/trespass, false imprisonment, intentional infliction of emotional distress, and negligence, are hereby DISMISSED without prejudice.

IT IS SO ORDERED.