268 F.3d 646 (9th Cir. 2001)
 JEANNINE JACKSON, PLAINTIFF-APPELLANT,
v.
CITY OF BREMERTON; PAUL DUFRESNE, POLICE CHIEF OF BREMERTON; R. DAHLBERG, BREMERTON POLICE OFFICER #470, ET UX; T.L. PRATT, SGT., BREMERTON POLICE DEPT., ET UX; D. ERIKSEN, BREMERTON POLICE #434, ET UX; R. CRONK, DETECTIVE, ET UX; PETER MENDIOLA, BREMERTON POLICE #520, ET UX; W.L. DAVIS, BREMERTON POLICE #425,
ET VIR; C.A. SCHULTZ, BREMERTON POLICE #447, ET UX; D. HUGHES, BREMERTON POLICE #454, ET VIR; AND OFFICER ALLOWAY, DEFENDANTS-APPELLEES.
 No. 99-36159
 UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT
 Submitted August 7, 2001*
Filed October 5, 2001
 
 Timothy M. Greene, Puyallup, Washington, for the plaintiff-appellant.
 Steven Reich, Gordon, Thomas, Honeywell, Malanca, Peterson & Daheim Seattle, Washington, for the defendants-appellees.
 Appeal from the United States District Court for the Western District of Washington; Robert J. Bryan, District Judge, Presiding. D.C. No. CV-98-05502-RJB
 Before: Tashima and Tallman, Circuit Judges, and Mollway,** District Judge.
 Richard C. Tallman, Circuit Judge:
 
 
 1
 Appellant Jeannine Jackson ("Jackson") originally brought this action under 42 U.S.C. &#167 1983 and Washington state tort law against nine individual police officers ("the officers"), the City of Bremerton, and Police Chief Paul DuFresne. On appeal Jackson claims the officers violated her Fourth Amendment rights by using excessive force in arresting her at a family barbecue in a public park when she attempted to interfere with the arrest of her adult son on an outstanding warrant. She also seeks to hold liable the City of Bremerton and Police Chief DuFresne on the ground that the officers' acts of excessive force against her and her group represent an informal custom employed by the City in response to emergency situations. The district court granted summary judgment in favor of all defendants. We have jurisdiction under 12 U.S.C. &#167 1291, and we affirm.
 
 I.
 
 2
 On July 13, 1996, Jackson and 30 to 50 friends and family members gathered at a public park in Bremerton, Washington. Officers Dahlberg and Eriksen, who were patrolling the area on bicycles, responded to a report that the group was consuming alcohol in the park. While speaking with members of the Jackson party, Officer Dahlberg recognized Jackson's son, Kevin Blake, from previous contacts. Officer Dahlberg checked Blake's name for wants and learned that there was an outstanding robbery warrant. The warrant arose out of Blake's failure to make payments on a felony charge that had been reduced to a misdemeanor theft conviction. Because Blake had previously caused problems for arresting officers, Officer Dahlberg called for backup.
 
 
 3
 Officers Dahlberg and Eriksen informed Blake, who was standing in a separate area of the park, of the outstanding warrant. Blake told the officers to speak with his mother. Blake's mother then argued with the officers regarding the nature of the warrant. Blake ran into the large group of people and tried to run out of the park. Several of his friends attempted to shield him from arrest. Officer Eriksen called for additional backup due to the escalating situation.
 
 
 4
 Officers Cronk and Mendiola were the next officers on the scene. After Officer Mendiola's arrival, Jackson was told that Officer Mendiola had been seen reaching for his holster and removing his gun. Jackson reacted by yelling at Officer Mendiola regarding his conduct. As the other officers continued to apprehend Blake, Jackson and her group yelled and swore at the officers, and advanced upon them. Fights broke out between the officers and other members of Jackson's group. Officers Dahlberg and Eriksen apprehended Blake shortly thereafter.
 
 
 5
 Officers Davis and Hughes were the next officers to arrive at the park. Additional help from surrounding police agencies was also summoned. A fight ensued between female Officer Davis and Deanna Ferguson, a 17-year-old female and family friend of Jackson's. Upon witnessing the altercation between Officer Davis and Ferguson, Jackson "ran to interfere" with the officer. At that point Jackson's hair was sprayed with a chemical irritant. Jackson did not recall which officer sprayed her. She did state, however, that the officers had warned "everyone" in advance that a chemical irritant would be used if she and her group did not disperse.
 
 
 6
 Jackson was then placed under arrest for failure to disperse. During her arrest, Jackson contends she asked Officer Pratt to allow her to go down to the ground herself due to pre-existing back and shoulder injuries. Jackson, who got to her knees and then leaned down, claims Officer Pratt "pushed[her] the rest of the way" down. Officer Pratt then placed his knee on her back and handcuffed her. Jackson contends Officer Pratt, and possibly another officer, roughly lifted her back up and put her in Officer Pratt's police car.
 
 
 7
 While Jackson was handcuffed in the police car, she yelled at Officer Davis regarding Ferguson's treatment. During the argument, Jackson said Officer Davis turned on the engine in 90 degree weather, rolled up the windows of the car, and stated, "I'll see what I can do to adjust your attitude." While she was in the police car, the chemical irritant in Jackson's hair ran into her eyes and ears. Within minutes of being placed in the car, Officer Davis sprayed Jackson with water to remove the chemical irritant. Jackson was then transported to the police station.
 
 
 8
 When Jackson's handcuffs were removed at the station, she noticed pain and swelling in her fifth finger. Jackson said she received immediate medical attention while at the station, and was subsequently diagnosed with a fractured finger. Jackson contends she has suffered permanent damage to that finger.
 
 
 9
 Five arrests were made as a result of this incident. All five people, including Jackson, were convicted of various misdemeanors. Jackson and Blake later filed suit against the City of Bremerton, Police Chief DuFresne, and the officers. Blake was dismissed from this lawsuit pursuant to a stipulated voluntary dismissal with prejudice. The remaining defendants then moved for summary judgment against Jackson. The district court granted the motion on all claims. Jackson timely appeals.
 
 II.
 
 10
 We review de novo a district court's grant of summary judgment on the ground of qualified immunity. See LSO, Ltd. v. Stroh, 205 F.3d 1146, 1157 (9th Cir. 2000). Viewing the evidence in the light most favorable to the nonmoving party, we must determine whether there are any genuine issues of material fact, and whether the district court correctly applied the relevant substantive law. See Lopez v. Smith , 203 F.3d 1122, 1131 (9th Cir. 2000) (en banc).
 
 III.
 
 11
 A private right of action exists against police officers who, acting under color of state law, violate federal constitutional or statutory rights. 42 U.S.C. &#167 1983. The defense of qualified immunity, however, protects &#167 1983 defendants from liability for civil damages when performing discretionary functions, unless such conduct violates a clearly established constitutional or statutory right of which a reasonable person would have known. See Anderson v. Creighton, 483 U.S. 635, 640 (1987).
 
 
 12
 In considering the merits of a qualified immunity defense in excessive force cases, courts previously considered whether the right was clearly established and, if so, whether, in light of such clearly established law, a reasonable officer could have known that his/her conduct was unlawful. See Saucier v. Katz, ___U.S.___, 121 S. Ct. 2151, 2155 (2001) (citing Graham v. O'Connor, 490 U.S. 386 (1989), and Anderson v. Creighton, 483 U.S. 635 (1987)). The Supreme Court, however, recently revisited the above analysis, clarifying the sequence of inquires for qualified immunity cases. Id. at 2158.
 
 
 13
 After Saucier, a qualified immunity analysis must begin with this threshold question: based upon the facts taken in the light most favorable to the party asserting the injury, did the officer's conduct violate a constitutional right? Id. at 2156. If no constitutional right was violated, the court need not inquire further. Id. If, however, a constitutional violation occurred, the second inquiry is whether the officer could nevertheless have reasonably but mistakenly believed that his or her conduct did not violate a clearly established constitutional right. Id. at 2158-59. Saucier's qualified immunity inquiry, requiring courts to focus first on the underlying constitutional issue, is intended to assist courts in disposing of insubstantial suits at an early stage of litigation, in addition to encouraging courts to "set forth principles which will become the basis for a holding that a right is clearly established." Id. at 2156.
 
 
 14
 In considering the first step of Saucier's two-step qualified immunity inquiry, we must determine whether Jackson's constitutional right to be free from excessive force was violated. Under the Fourth Amendment, officers may only use such force as is "objectively reasonable" under the circumstances.[1] Graham v. O'Connor , 490 U.S. 386, 397 (1989). To determine whether the force used was reasonable, courts balance "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." Id. at 396 (citations omitted). "The `reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Id. (citing Terry v. Ohio, 392 U.S. 1, 20-22 (1968)).
 
 
 15
 In addition, the court's consideration of "reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments--in circumstances that are tense, uncertain, and rapidly evolving--about the amount of force that is necessary in a particular situation." Id. at 396-97. "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers' violates the Fourth Amendment." Id. at 396 (quoting Johnson v. Glick, 481 F.2d 1028, 1033 (2d Cir. 1973)).
 
 
 16
 In evaluating the nature and quality of the intrusion, we must consider "the type and amount of force inflicted" in arresting Jackson. Chew v. Gates, 27 F.3d 1432, 1440 (9th Cir. 1994). In this case, Jackson asserts: 1) she was sprayed with a chemical irritant prior to her arrest; 2) three officers pushed her to the ground to handcuff her and roughly pulled her up to her feet during her arrest;[2] and 3) an officer "rolled up the windows and turned up the engine in the July heat in order to `adjust her attitude.' "
 
 
 17
 Assuming Jackson's version of the facts is correct, the nature and quality of the alleged intrusions were minimal. After interfering with Officer Davis' efforts to arrest another member of Jackson's party, Jackson's hair was sprayed with a chemical irritant. Jackson then alleges injury during what she admits was a normal handcuffing procedure. Upon being placed in a police car, Jackson continued to argue with Officer Davis. Officer Davis therefore rolled up the windows of the police car. The chemical irritant dripped onto Jackson's face. Cf. Headwaters Forest Def. v. County of Humboldt, 240 F.3d 1185, 1199 (9th Cir. 2000) (finding use of pepper spray could be excessive when "applied to [protestors'] eyelids with a Q tip--and even more so when sprayed into their faces in full blasts from inches away"), cert. granted, judgment vacated, ___U.S.___, 122 S.Ct. 24, ___L.Ed.2d___ (2001).[3] As a result, Jackson asked Officer Davis to spray her with water to remove the chemical irritant. Officer Davis tended to Jackson upon her request. Approximately three to five minutes elapsed between the time Officer Davis rolled up the windows of the police car and the time Jackson was treated with water.
 
 
 18
 Next, the court must balance Jackson's alleged intrusions against the governmental interests at stake. In evaluating the government's interests, the court may consider such factors as "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Graham, 490 U.S. at 396 (citing Tennessee v. Garner, 471 U.S. at 8-9 (1985)).
 
 
 19
 Here, the governmental interest began with an attempt to arrest Blake on an outstanding felony warrant. As Blake fled the scene, the officers, who were substantially outnumbered, were faced with a group that refused to obey the officers' commands to disperse; that shouted at the officers; and that engaged the officers in verbal and physical altercations. The safety interest in controlling the group increased further when the group was warned by police that a chemical irritant would be used if they did not move back from the area, and the group refused to comply. Jackson, who heard the warning, also chose to ignore the officers' orders, and instead began to directly interfere with Officer Davis' attempt to maintain order.
 
 
 20
 Jackson's active interference posed an immediate threat to the officers' personal safety and ability to control the group. Under circumstances that Jackson herself described as a "melee," the force applied was reasonable and necessary to control a "rapidly evolving" and escalating situation. See id. at 397; Alexander v. City & County of San Francisco, 29 F.3d 1355, 1367 (9th Cir. 1994) (finding that "the need for force . . . is at the heart of the . . . Graham factors").
 
 
 21
 Nevertheless, Jackson contends that the district court erroneously concluded that the "officers were greatly outnumbered and trying to maintain control of the situation." She asserts "there is no undisputed evidence presented that Jackson's family and friends had physically or verbally threatened any of the Bremerton police officers or in any other manner breached the peace, except for the combat between Officer Davis and Deanna Ferguson . . . ." Jackson's own testimony, however, belies these assertions.[4]
 
 
 22
 On balance, applying the Graham analysis, we conclude that the use of force was not excessive in this case. Because no Fourth Amendment violation occurred, the district court properly granted summary judgment in the officers' favor.[5]
 
 IV.
 
 23
 A municipality may be held liable under &#167 1983"when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury . . . ." Monell v. Dep't of Soc. Serv., 436 U.S. 658, 694 (1978). See also Wallis v. Spencer, 202 F.3d 1126, 1136 (9th Cir. 2000). A supervisor may be held liable under &#167 1983 if he or she was personally involved in the constitutional deprivation or a sufficient causal connection exists between the supervisor's unlawful conduct and the constitutional violation. See Larez v. City of Los Angeles, 945 F.2d 630, 645 (9th Cir. 1991); Hansen v. Black, 885 F.2d 645-46 (9th Cir. 1989).
 
 
 24
 Neither a municipality nor a supervisor, however, can be held liable under &#167 1983 where no injury or constitutional violation has occurred. See City of Los Angeles v. Heller, 475 U.S. 796, 799 (1986) (holding "[i]f a person has suffered no constitutional injury at the hands of the individual police officer, the fact that the departmental regulations might have authorized the use of constitutionally excessive force is quite beside the point."); Grossman v. City of Portland, 33 F.3d 1200, 1203 (9th Cir. 1994) (same). Because Jackson's Fourth Amendment right to be free from excessive force was not violated, there is no basis upon which to find appellees liable for the alleged use of excessive force. The district court correctly rejected Jackson's municipal liability claim against the City of Bremerton and Police Chief DuFresne.
 
 
 25
 AFFIRMED.
 
 
 
 Notes:
 
 
 *
 The panel unanimously finds this case suitable for decision without oral argument. See Fed. R. App. P. 34(a)(2).
 
 
 **
 Honorable Susan Oki Mollway, United States District Judge for the District of Hawaii, sitting by designation.
 
 
 [1]
 While the test for reasonableness is often a question for the jury, this issue may be decided as a matter of law if, in resolving all factual disputes in favor of the plaintiff, the officer's force was"objectively reasonable" under the circumstances. See Scott v. Henrich , 39 F.3d 912, 915 (9th Cir. 1994). See also Liston v. County of Riverside , 120 F.3d 965, 976 n.10 (9th Cir. 1997).
 
 
 [2]
 Although Jackson contends for the first time on appeal that there were three officers involved, there is no evidence in the record to support this contention.
 
 
 [3]
 While Headwaters Forest Defense discussed the reasonableness of employing pepper spray against a group of protestors, the factual circumstances and procedural posture of that case differ dramatically from the case at hand. In Headwaters, a small group of passive environmental demonstrators (between 2-7 people) used lock-down devices to physically link themselves together so that the police would have difficulty removing them. On three separate occasions the police chose to re-apply pepper spray to the demonstrators' eye-lids and face, instead of removing the lock-down devices. We did not decide whether the use of pepper spray constituted excessive force in that case. Instead, we considered whether the district court erred in directing a verdict for the municipal defendants in light of the evidence in the record. Because the record in that case contained "vigorously disputed" facts and raised substantial questions regarding the reasonableness of using pepper spray against a small group of passive demonstrators, we held that on the record the district court erred. We do not decide whether Headwaters remains good law in this Circuit in light of Saucier. But we note that the Ninth Circuit's &#167 1983 analysis employed in Headwaters, 240 F.3d at 1206-09, was specifically rejected by the Supreme Court in Saucier, 121 S. Ct. at 2155.
 
 
 [4]
 Jackson also contends that Officer Mendiola "made the first aggressive move" when he reached for his gun upon arriving at the scene. It is unclear from Jackson's brief whether she asserts this as an additional claim. Regardless, Jackson admitted in her deposition that she did not witness Officer Mendiola reach for his holster or remove his weapon. Because Jackson was not a witness to, nor involved in, this specific incident, she does not have standing to assert this claim and cannot competently testify that it even occurred.
 
 
 [5]
 In light of our holding, we need not reach the second step of Saucier's qualified immunity inquiry. However, were we to conclude that the force used was excessive, Jackson has not shown that the use of chemical irritants in overcoming resistance to a lawful arrest violated a clearly established constitutional right. A reasonable police officer could properly believe that the use of this level of force would not violate a clearly established constitutional right.