340 F.3d 787
 James JOHNSON, III, Plaintiff-Appellee,
v.
COUNTY OF LOS ANGELES; Leroy Baca; Terry Spindler; Thomas Hill; Doug Duvall; James Mee; John Clark; Julian Wallace; Nellifern Thomas, Defendants, and
Michael Woodard, Defendant-Appellant.
 No. 02-55881.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted June 6, 2003.
 Filed August 15, 2003.
 
 Steven D. Blades, Manning & Marder Kass Ellrod Ramirez, LLP, Los Angeles, California, for the defendant-appellant.
 Paul L. Hoffman, Schonbrun Desimone Seplow Harris & Hoffman, LLP, Venice, California, for the plaintiff-appellee.
 Appeal from the United States District Court for the Central District of California; Harry L. Hupp, District Judge, Presiding. D.C. No. CV-00-09687-GHK.
 Before TROTT, TALLMAN, Circuit Judges, and COLLINS,* District Judge.
 OPINION
 TROTT, Circuit Judge:
 
 
 1
 In the course of his flight from police and ensuing arrest for armed robbery, James Johnson ("Johnson") was rendered a paraplegic. He brought claims arising from his injury against several of the involved law enforcement officers, medical service workers, and their employer, the County of Los Angeles. Relevant to this interlocutory appeal is a 42 U.S.C. § 1983 claim against Deputy Michael Woodard ("Deputy Woodard") for excessive use of force, which Johnson asserts was the direct cause of his paraplegia. Deputy Woodard challenges the district court's denial of his motion for summary judgment seeking qualified immunity. We reverse and remand with instructions to enter summary judgment in favor of Deputy Woodard.
 
 BACKGROUND
 
 2
 In September 1999, Johnson, on parole from prison, and Myron Edwards ("Edwards") robbed a bank in Malibu, California. The record is clear that law enforcement authorities were immediately informed that it was an armed robbery. The robbers fled from the bank in a red Chevrolet Corsica, with Edwards driving and Johnson lying down in the back seat. Johnson was not wearing a seatbelt. When Los Angeles County Sheriff's deputies spotted the suspect vehicle, Edwards led them on an hour-long chase, reaching speeds of nearly one hundred miles per hour. Johnson was not visible, and the deputies were not aware of his presence. The chase finally ended on the southbound 405 freeway when Edwards attempted a high-speed swerve that caused the getaway car to go out of control. The car spun one-hundred-eighty degrees as it slid across several lanes of traffic and crashed into the concrete center divider. Carried by its momentum and now facing backward, the getaway car skidded along the center divider until it came to a stop. The crash and ensuing arrests were recorded by news helicopters covering the chase. A copy of one of those video recordings was reviewed by the district court and is part of the record on appeal. The video recording shows that the car's impact into the center divider was less than dramatic.
 
 
 3
 Deputy Woodard along with Deputy Hill were the first deputies to reach the immobile getaway vehicle. To Deputy Hill, the chase appeared to be far from over, as is apparent from his deposition:
 
 
 4
 Q When you looked at the red vehicle from your position, the shoulder area [of the road], could you see the driver?
 
 
 5
 A Yes.
 
 
 6
 Q And how far away would you estimate your distance to be from the driver when you stopped at the right shoulder?
 
 
 7
 A At least across four lanes of traffic, so 60 to 80 feet maybe.
 
 
 8
 Q What, if anything, did you see the driver doing when you looked at the red vehicle?
 
 
 9
 A I saw his back and he was facing the — facing the east. He was moving around inside of the car. I saw him trying to get across the inside of the car. I believe that he was going to exit the vehicle through the passenger's side and then run across the freeway.
 
 
 10
 * * *
 
 
 11
 Q Were you fearing for anyone's life when you ran to the suspect vehicle?
 
 
 12
 A Yes, the people on the other side of the freeway.
 
 
 13
 Q What were you fearful of?
 
 
 14
 A That this person that we had just pursued for a lengthy time period, who was an armed felon, was trying to escape from the vehicle. I believed that he was going to get out of the car near the passenger side, go over the guardrail and run across the north-bound lanes of the freeway, he was going to escape, possibly injuring someone on the other side of the freeway or a combination of both.
 
 
 15
 Q So you believe[d] this person to be an armed felon; is that correct?
 
 
 16
 A Yes.
 
 
 17
 When the deputies reached the vehicle, they were surprised to see Johnson in the back seat. According to Johnson's later sworn statement, when the deputies arrived at the car, he sat up in the back seat and raised his hands over his head but quickly laid back down when an officer pointed a gun at him. In his deposition, Deputy Woodard described his arrival at the vehicle and his discovery of Johnson:
 
 
 18
 Q When was the first time that you saw Mr. Johnson in the vehicle after the collision?
 
 
 19
 A As I came around the back of the vehicle and jumped over the concrete barrier and started to approach the passenger side, I saw him down in the back seat.
 
 
 20
 Q In what position?
 
 
 21
 A Laying in the same position.
 
 
 22
 * * *
 
 
 23
 Q When you saw him, that was the first time that you saw him; is that correct?
 
 
 24
 A Yes.
 
 
 25
 Q That was what he was doing, he was moving around, his hands were moving around; right?
 
 
 26
 A Right.
 
 
 27
 Q The way that you are describing it is flailing?
 
 
 28
 A It was not flailing, it was more of a trying to cover up type of thing.
 
 
 29
 Q Could you see his hands or you just saw the cover that he had covered himself with?
 
 
 30
 A I just saw the object that was covering him. I could — I could only guess where his hands were based upon the movements that I saw.
 
 
 31
 Q You could not see his hands at that time?
 
 
 32
 A No, I could not.
 
 
 33
 Q They were under the cover? A Yes.
 
 
 34
 Q How long did you stay on that side of the car when you saw that?
 
 
 35
 A At the point that I saw that, I was extremely concerned for the safety of the other deputies and myself.
 
 
 36
 Q Why?
 
 
 37
 A Because we have armed bank robbers here. I was afraid he had a gun.
 
 
 38
 Q What did you do in concern [sic] that he had a gun?
 
 
 39
 A I immediately tried to break out the window to get control of his hands. I realized I was not going to be able to do that within a — quickly, so I went and noticed that the driver's side window was either down or shattered out, I don't recall. There was no driver's window there. I went to the driver's window, I yelled at him to let me see his hands, and I was also trying to tell the deputies that were now on the other side of the car that we had a second suspect in the back because I could not tell if they had focused on him, nor had I heard anybody say that we had a suspect in the back of the vehicle.
 
 
 40
 The deputies pulled Edwards from the car first, but because the driver's door would not open they pulled him over the driver's seat and out the back door. In the process, the driver's seat reclined back, pinningJohnson's legs against the back seat. Edwards was not injured in either the crash or his arrest.
 
 
 41
 As Edwards was being handcuffed, Deputy Woodard entered the back of the vehicle to remove Johnson and take him into custody. According to Johnson, Deputy Woodard yanked, pulled, jerked and twisted his body "with a lot of force," and it felt like he "was being pulled apart" as Deputy Woodard tried to free him from the car. Johnson exclaimed to Deputy Woodard that he was stuck under the reclined seat and that Deputy Woodard was hurting him. Deputy Woodard believed Johnson's pain was caused by his pinned legs, and later explained under oath that he had seen "hundreds of people that [were] truly in pain," and based on the signs Johnson was showing he believed that Johnson's pain was "very minor." Deputy Woodard believed also that Johnson was "trying to get [him] to back off so [Johnson] could either retrieve a gun or attempt to escape." Johnson has not identified any additional signs of pain that Deputy Woodard should have recognized, nor has he explained how the signs he was showing should have indicated that he had a back injury. Given the circumstances, Deputy Woodard's perceptions and concerns were entirely reasonable.
 
 
 42
 After about forty seconds inside the car, Deputy Woodard succeeded in removing Johnson. After Deputy Woodard dropped him to the ground, Johnson felt what he described as a knee coming down on his back followed by a feeling like his "body was going to sleep," and Johnson could no longer feel his legs. The video recording shows that if a knee was in fact placed on his back, it was not done with any significant degree of force. Johnson was quickly handcuffed, lifted off the ground, and taken to the police cruiser with his legs dragging. The deputies believed he was dragging his feet as a form of passive resistance. It was later determined that Johnson permanently had been rendered a paraplegic at some unknown point in the course of the crash and arrest. The district court concluded that Deputy Woodard did not use excessive force either when he dropped Johnson on the ground, which Johnson claimed was from three to four feet up, or by placing a knee on his back. Because Johnson does not challenge those findings on appeal, we do not consider those facts as material to the questions before us.
 
 
 43
 Johnson sued the County of Los Angeles and several people who were involved in the incident, alleging a variety of claims that the district court described as "all of the torts listed in the table of contents" of a major treatise, plus a few others. The district court granted summary judgment to most defendants. As for Deputy Woodard, however, the district court concluded that whether he "knew or should have known" that Johnson had suffered a back injury was an issue of fact that precluded summary judgment on both the claim of excessive force and the defense of qualified immunity. The district court did conclude, however, that absent such knowledge, Deputy Woodard's actions did not amount to excessive force.
 
 DISCUSSION
 
 44
 We are asked to decide whether Deputy Woodard is entitled to summary judgment on the basis of qualified immunity. The Supreme Court in Saucier v. Katz, 533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001), explained why qualified immunity should be determined early in the proceedings:
 
 
 45
 [A] ruling on that issue should be made early in the proceedings so that the costs and expenses of trial are avoided where the defense is dispositive. Qualified immunity is "an entitlement not to stand trial or face the other burdens of litigation." Mitchell v. Forsyth, 472 U.S. 511, 526, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985). The privilege is "an immunity from suit rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial." Ibid. As a result, "we repeatedly have stressed the importance of resolving immunity questions at the earliest possible stage in litigation." Hunter v. Bryant, 502 U.S. 224, 227, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991) (per curiam).
 
 
 46
 Id. at 200-01, 121 S.Ct. 2151 (emphasis in original). This requirement calls upon courts, not juries, to settle the ultimate questions of qualified immunity.
 
 
 47
 We review de novo the district court's denial of a motion for summary judgment based on qualified immunity. White v. Lee, 227 F.3d 1214, 1226 (9th Cir.2000). "Viewing the evidence in the light most favorable to the nonmoving party, we must determine whether there are any genuine issues of material fact, and whether the district court correctly applied the relevant substantive law." Jackson v. City of Bremerton, 268 F.3d 646, 650 (9th Cir.2001).[1]
 
 
 48
 * In Saucier, the Supreme Court established a two-step evaluation of qualified immunity. The analysis contains both a constitutional inquiry and an immunity inquiry. For the constitutional inquiry, courts must determine this threshold issue: "based upon the facts taken in the light most favorable to the party asserting the injury, did the officer's conduct violate a constitutional right?" Jackson, 268 F.3d at 651; Saucier, 533 U.S. at 201, 121 S.Ct. 2151. If there was a constitutional violation, "the second inquiry is whether the officer could nevertheless have reasonably but mistakenly believed that his or her conduct did not violate a clearly established constitutional right." Id.; Saucier, 533 U.S. at 201-05, 121 S.Ct. 2151.
 
 
 49
 The Supreme Court explained that determination of the threshold constitutional inquiry is intended to "set forth principles which will become the basis for a holding that a right is clearly established" in later cases. Saucier, 533 U.S. at 201, 121 S.Ct. 2151. The Court further explained that "[t]he law might be deprived of this explanation were a court simply to skip ahead to the question whether the law clearly established that the officer's conduct was unlawful in the circumstances of the case." Id. Thus, even though Deputy Woodard's argument on appeal focuses on the immunity inquiry, it is necessary for us first to consider the constitutional inquiry.
 
 
 50
 In this first step of the Saucier analysis, we must determine whether Deputy Woodard violated Johnson's Fourth Amendment right to be free from an excessive use of force. "Under the Fourth Amendment, officers may only use such force as is `objectively reasonable' under the circumstances." Jackson, 268 F.3d at 651 (quoting Graham v. Connor, 490 U.S. 386, 397, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989)). "The `reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Graham, 490 U.S. at 396, 109 S.Ct. 1865. "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers violates the Fourth Amendment." Id. (quotation marks and citation omitted). The determination of reasonableness "must embody allowance for the fact that police officers are often forced to make split-second judgments — in circumstances that are tense, uncertain, and rapidly evolving — about the amount of force that is necessary in a particular situation." Id. at 396-97, 109 S.Ct. 1865.
 
 
 51
 When determining whether the amount of force used was reasonable, courts must balance "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." Id. at 396, 109 S.Ct. 1865 (internal quotation marks omitted). To engage in this balancing act, we must review the facts.
 
 
 52
 The uncontroverted facts show that "from the perspective of a reasonable officer on the scene," id., Deputy Woodard was facing armed suspects who had led police on a long, dangerous chase, ending when the suspects' getaway car crashed. The deputies then observed the driver attempting to escape on foot, and were surprised to discover Johnson hiding in the back seat. Only moments before Deputy Woodard attempted to pull Johnson out of the car, he had been sitting up with hands raised and then quickly laid back down when a gun was pointed at him. Deputy Woodard observed Johnson moving his hands around while hidden from view under a cover, causing him to be concerned about his possible possession of a weapon. Deputy Woodard also had just watched or helped other officers drag the other occupant of the vehicle over the front seat and out the back door without any injuries. When Deputy Woodard started "yanking, pulling, jerking, and twisting" the suspect, the suspect indicated that it hurt, but (1) the suspect's legs were pinned under the reclined driver's seat — an objectively apparent cause of the pain, (2) the suspect was not showing typical signs of serious pain, and (3) the suspect may very well have been trying to get Deputy Woodard to back off so he could retrieve a weapon or attempt to flee.
 
 
 53
 There is yet another angle to these circumstances. Understandably, paramedics will not become involved until suspects like Johnson and Edwards are rendered safe. Deputy Woodard explains:
 
 
 54
 Q Was there any reason why you did not call in an emergency vehicle or paramedics when Mr. Johnson first told you that he was hurt or injured?
 
 
 55
 A Well, I wanted to — first of all and probably foremost, I did not feel that [Johnson] had any serious injury. If injured at all, it was minor; and second of all, we needed to get him under control and be sure that the situation was safe for all of us, and the fact that the fire department will not respond or come in until the situation is safe anyway.
 
 
 56
 Q Fire Department wouldn't come in until the situation as [sic] safe. The situation was safer when you put Mr. Johnson on the ground; is that correct?
 
 
 57
 A Once he was searched.
 
 
 58
 Q It was safe; right?
 
 
 59
 A Except for the fact that we may still have had somebody in the trunk area, it was safe, yes.
 
 
 60
 Notably, on the "intrusion on his Fourth Amendment Rights" side of the scale, Johnson does not allege anything more violent than hard pulling and twisting. We conclude that hard pulling and twisting applied to extract a moving armed robbery suspect from a getaway car under these circumstances is a minimal intrusion on his Fourth Amendment interests. On the other side of the scale, the "countervailing governmental interests" are measured by such factors as "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Graham, 490 U.S. at 396, 109 S.Ct. 1865. We discern substantial "governmental interests" in this case. Armed bank robbery is without question a very serious crime, and armed robbery suspects pose an obvious and significant danger to the police and others. Moreover, Johnson and his confederate Edwards further demonstrated their willingness to impose a life-threatening danger upon the police and the public by their lengthy high-speed flight from the deputies.
 
 
 61
 We conclude that the balance tips decisively in favor of the governmental interests in this case. Even though Johnson, as he alleges, was not actively resisting arrest at the time Deputy Woodard was pulling him from the car, the force applied to remove him was patently reasonable and commensurate with what was needed. We recognize that under the right circumstances hard pulling and twisting might amount to excessive force, but such circumstances were not present in this case. There was no indication to Deputy Woodard that Johnson had suffered a debilitating back injury,[2] and the law does not hold Deputy Woodard accountable for information that only the "20/20 vision of hindsight" can provide. Id. We find it very difficult to imagine that any police officer facing a moving, armed bank robbery suspect would have acted any differently — at least not without taking the very real risk of getting himself or others killed. The need to quickly restrain Johnson by removing him from the car and handcuffing him was paramount. Thus, the force Deputy Woodard used to remove Johnson from the car and take him into custody was "objectively reasonable" and cannot under any view of the evidence be deemed excessive.
 
 
 62
 Because we conclude that Deputy Woodard did not violate Johnson's Fourth Amendment rights, we need not reach the immunity inquiry. Saucier, 533 U.S. at 201, 121 S.Ct. 2151. However, had we concluded that the use of force was not objectively reasonable, we could not conclude that it was a violation of Johnson's clearly established rights. Id. at 201-02, 121 S.Ct. 2151. Moreover, "[t]he concern of the immunity inquiry is to acknowledge that reasonable mistakes can be made as to the legal constraints on particular police conduct," id. at 205, and Deputy Woodard reasonably could have believed that his conduct was lawful under the circumstances.
 
 II
 
 63
 Deputy Woodard appeals also the district court's denial of his motion for summary judgment on Johnson's state law claim of assault and battery. This claim is dependent upon Deputy Woodard applying an unreasonable amount of force. Edson v. City of Anaheim, 63 Cal.App.4th 1269, 74 Cal.Rptr.2d 614, 616 (1998). Because we hold that the force used was not unreasonable, the state law claim must fail.
 
 CONCLUSION
 
 64
 The district court erred in denying summary judgment to Deputy Woodard. His use of force was objectively reasonable and he is entitled to qualified immunity. On remand, we instruct the district court to enter summary judgment in favor of Deputy Woodard on Johnson's state law claim as well as the claim of excessive use of force.
 
 
 65
 REVERSED and REMANDED.
 
 
 
 Notes:
 
 
 *
 Honorable Raner C. Collins, United States District Judge for the District of Arizona, sitting by designation
 
 
 [1]
 Johnson's argument that we lack jurisdiction is without merit. We held inSchwenk v. Hartford, 204 F.3d 1187, 1195 (9th Cir.2000), that we have jurisdiction over interlocutory appeals that concern qualified immunity even when "the determination of qualified immunity depends upon disputed issues of material fact" so long as "we assume the version of the material facts asserted by the non-moving party to be correct." Therefore, resolving all genuine and material factual disputes in Johnson's favor, we have jurisdiction to determine whether Woodard is entitled to qualified immunity.
 
 
 [2]
 Because the facts do not compel us to do so, we do not express an opinion on whether Deputy Woodard's use of force would have been unreasonable if there were sufficient indicia that Johnson had suffered a serious back injury