BEEZER, Circuit Judge,
concurring in part and dissenting in part:
In our judicial system, the jury is tasked with determining the credibility of witnesses and divining from the various testimonies what really happened. Because summary judgment deprives a party of the opportunity to have the jury examine the facts, we must view the evidence in the light most favorable to the party who is not seeking summary judgment, here, the plaintiff, Karey Luchtel. Rather than view the evidence in Ms. Luchtel’s favor, the court’s opinion ignores key testimony from a neutral witness that supports Ms. Luchtel’s case and relies instead on the Seattle Police Department officers’ version of events. This case should have gone to the jury on the excessive-force and assault-and-battery claims, and I dissent.[1]
I
If we view the facts in the light most favorable to Ms. Luchtel, the scene unfolds quite differently than the opinion of the court relates. When the Seattle Police Department officers entered the Walds’ house on the night in question, Ms. Wald was sitting on the sofa with her arm around Ms. Luchtel, comforting her. After the officers announced themselves to Mr. Wald at the door, they “barg[ed]” into the living room where the women were sitting, did not say anything to anyone, and went straight for Ms. Luchtel. Ms. Luchtel, who was suffering from paranoia, became extremely frightened and said that the police weren’t the real police. Mr. and Ms. Wald, however, were unnerved and apprehensive too. Mrs. Wald testified that she was “very shocked” when the police came in because “neither my husband nor I called the police” and “they just barged in.” Mr. Wald testified that he was “alarmed by [the officers’] very presence there” and sought to get Ms. Luchtel’s son out of the room in case something happened. .He took the boy downstairs and out the back door.
Ms. Wald also retreated from the officers. She took her arm off of Ms. Luchtel, and walked over to the organ bench. As Ms. Wald recounted, “I thought if the police were going to go over to her, I wasn’t going to get involved with the police.” Ms. Luchtel followed Ms. Wald, whom Ms. Luchtel viewed as providing comfort and safety. She stood behind Ms. Wald. The police lunged toward the women, and Ms. Luchtel grabbed onto Ms. Wald, and both women fell on the floor. During the fall, Ms. Wald’s blouse buttons came undone. As Ms. Wald was “put[ting] [her]self together,” Ms. Luchtel was still lying on the floor. According to Ms. Wald, an officer then “tackled” Ms. Luchtel, and the other officer quickly joined him. Ms. Luchtel, still terrified, said, “Don’t let them take me. They’re not the police.” In response, the officers taunted her, saying “you’ll know that we’re the real police.” “[T]hey were not very kind to her, I must admit,” Ms. Wald recalled.
Ms. Wald testified that after the officers tackled Ms. Luchtel, they were immediately able to control and handcuff her: “She wasn’t able to fight, the poor thing. She was on the floor. She wasn’t — they had her arms behind her, and she was literally *986 on her front. And they couldn’t — they had her legs shackled and her arms shackled so she couldn’t move.” The officers reported that they used their body weight to hold Ms. Luchtel down even after she was in handcuffs. At some point later, the ambulance arrived, and Ms. Luchtel was transported to the hospital. At the hospital, the doctors observed bruises, swelling, and abrasions on Ms. Luchtel’s forearms, abdomen, hip, and lower extremities. Worse, she had suffered a dislocated shoulder and torn shoulder ligaments. The dislocation had caused a Hill-Sachs fracture — a bone fragment had chipped off in the process of the dislocation and was lodged in the rotator cuff between her socket and arm — and surgery would be necessary. She had surgery to fix her shoulder, but she can no longer swim, hike, play tennis, or even eat normally.
II
Considering the facts favorable to Ms. Luchtel, I cannot agree with the analysis of the Graham v. Connor, 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989), factors set out in the court’s opinion.
First, the “most important single element” — “whether the suspect poses an immediate threat to the safety of the officers or others” — weighs in Ms. Luchtel’s favor. Smith v. City of Hemet, 394 F.3d 689, 702 (9th Cir.2005) (en banc) (emphasis added) (quoting Chew v. Gates, 27 F.3d 1432, 1441 (9th Cir.1994)). In concluding that this factor weighs against Ms. Luchtel, the opinion of the court relies on events that took place before the officers used force against her. The opinion argues that the fact that Ms. Luchtel hid under the car and yelled that someone was trying to kill her shows that she posed a danger to the officers, the Walds, or her son. However, this factor must be analyzed at the time the officers used the alleged excessive force.
At the time force was used Ms. Luchtel did not pose an immediate danger to anyone. Mr. Wald and Ms. Luchtel’s son had already left the room so she posed no danger to them. Ms. Luchtel also did not pose a threat to the Seattle Police Department officers — she was an unarmed, 5'3", 120 pound woman, face-down on the floor. The officers were both 6'4"; one weighed 185 pounds and the other 235 pounds. And a reasonable jury could conclude that the officers would have known that Ms. Luchtel did not pose a danger to Ms. Wald. When the officers first entered the Walds’ home, they observed Ms. Wald sitting with her arm around Ms. Luchtel, comforting her. Ms. Wald testified that she was not afraid of Ms. Luchtel at any point and that Ms. Luchtel had not done anything to try and hurt Ms. Wald or the officers.
A reasonable jury could believe that the officers reasonably thought that Ms. Luchtel assaulted Ms. Wald when the two women fell down — as the court’s opinion argues — but a reasonable jury could also believe that reasonable officers would have known that Ms. Luchtel was just scared and seeking protection from the motherly figure who had just been comforting her, Ms. Wald. The jury could believe that when the officers lunged for Ms. Luchtel, they made the women fall from their precarious position on the organ bench.
The point is not whether Ms. Luchtel posed a danger to herself or others in the long run without psychiatric help. I agree that the officers had reasonable cause to take Ms. Luchtel for psychiatric counseling and that they could use reasonable force to do so. But I think a reasonable jury could find that Ms. Luchtel posed no immediate danger to the officers, herself, or anyone *987 else at the time the officers “tackled” her and dislocated her shoulder.
Second, Ms. Luchtel’s crimes were not severe. The officers had probable cause to believe that she had possessed cocaine. They also had reasonable cause to believe that she was paranoid and mentally disturbed and needed to be taken in for mental evaluation. Ms. Luchtel also admits that she resisted arrest. But cocaine use, mental disability, and obstruction of justice are not severe crimes. See Davis v. City of Las Vegas, 478 F.3d 1048, 1055 (9th Cir.2007) (holding obstruction of justice not severe crime); Tatum v. City of S.F., 441 F.3d 1090, 1096 (9th Cir.2006) (holding cocaine use not severe crime).
And although the court’s opinion takes great pains to point out that domestic violence situations may be especially hazardous to police officers, this was not a domestic violence situation. The actions did arise out of an argument between spouses, but by the time the officers entered the Walds’ house, the officers knew that Ms. Luchtel had committed no violent acts, and Mr. and Ms. Luchtel were in separate houses.[2] Not every situation that takes place in a house or in the context of a family — and thus is “domestic” — poses the same level of threat to officers or others.
Third, there is a genuine dispute of material fact about how much Ms. Luchtel was actually resisting — or able to resist. Ms. Wald stated in her deposition that she did not remember Ms. Luchtel struggling with the officers at all:
Q: Was she doing anything to try and hurt the officers that you could tell?
A: I don’t think so. Not that I could see.... She went [down] with me on the floor, and when I got up, they went to her and kept her down on the floor. She was lying on the floor all the time.
Q: Did it look to you like they had any problems taking control of Karey?
A: I didn’t think they had any trouble. I didn’t think they had any problems with them, no.
Ms. Luchtel similarly testified that the struggle only lasted “a couple seconds.” The court’s opinion places a lot of stock in Mr. Wald’s testimony that he was “amazed” how much she struggled, but he was out of the room when the women fell on the floor and when the officers allegedly injured Ms. Luchtel. When he came back, Ms. Luchtel was already in handcuffs.
Fourth, the court’s opinion fails to analyze the three Graham factors in relation to the amount of force that the officers used. See Chew, 27 F.3d at 1441. “The three factors articulated in Graham ... are not to be considered in a vacuum but only in relation to the amount of force used to effect a particular seizure....” Id. Even accounting for the fact that Ms. Luchtel resisted arrest to some extent, there is still a genuine issue of material fact as to whether the officers used excessive force: “[I]f the extent of the injury ... is serious enough, a jury could conclude that [the officer] used force in excess of what was reasonable, even if [the plaintiff] had been resisting at the time.” LaLonde v. County of Riverside, 204 F.3d 947, 959 (9th Cir.2000) (emphasis added). Moreover, even if the officers did not use any more force than was needed to arrest Ms. Luchtel — a fact that is certainly in dispute — the excessive force inquiry is not over. The rele *988 vant inquiry is not whether the force the officers used “was no greater than that required to overcome [Ms. Luchtel’s] resistance .... [I]t is whether the force used was reasonable in light of all the relevant circumstances.” Hammer v. Gross, 932 F.2d 842, 846 (9th Cir.1991) (en banc). A reasonable jury could conclude that although Ms. Luchtel resisted arrest, the Seattle Police Department officers used excessive force by dislocating her shoulder, causing a Hill-Sachs fracture, and causing significant bruises, swelling, and abrasions on most of her body. Ms. Wald testified in her deposition that she was “not surprised if [Ms. Luchtel] did have an arm injury the way they, you know, put her arm around like this. They put her arms right around her back.” She emphasized: “These are big guys. And Karey is about the same size I am. And like I say to my kids, ‘Hey just be careful there, you buddies. You don’t know what you’re doing here.’ ”
Although it is true that the officers did not use tasers, batons, or other weapons to subdue Ms. Luchtel, that is not to say that the use of brute force and advantage in weight and size cannot be excessive. To say that would give officers a free pass as long as they just used their hands. The officers could always point to other weapons “they could have used.” I do not mean to suggest that “no court may grant summary judgment on excessive force where the police officers are physically much larger than the suspect,” Rather, I just think in light of the short time that Ms. Luchtel resisted, her minor crimes, the vast difference in size and weight, and Ms. Wald’s corroborating testimony, that a reasonable jury could conclude that the officers used excessive force. In light of these facts, a reasonable jury could find that the officers used excessive force when they pulled Ms. Luchtel’s arms around her back, when they used their body weight to keep her down even after she had been handcuffed, or when they left her “handcuffed [on the floor] so tight that it left scars.”
Finally, I believe the court’s opinion errs by failing to account for the fact that Ms. Luchtel was mentally disturbed. Our precedent holds that “a detainee’s mental illness must be reflected in any assessment of the government’s interest in the use of force.” Drummond ex rel. Drummond v. City of Anaheim, 343 F.3d 1052, 1058 (9th Cir.2003) (emphasis added). Indeed, we have specifically stated:
The problems posed by, and thus the tactics to be employed against, an unarmed, emotionally distraught individual who is creating a disturbance or resisting arrest are ordinarily different from those involved in law enforcement efforts to subdue an armed and dangerous criminal who has recently committed a serious offense. In the former instance, increasing the use of force may, in some circumstances at least, exacerbate the situation; in the latter, a heightened use of less-than-lethal force will usually be helpful in bringing a dangerous situation to a swift end. In the case of mentally unbalanced persons, the use of officers and others trained in the art of counseling is ordinarily advisable, where feasible, and may provide the best means of ending a crisis. ... [W]e emphasize that where it is or should be apparent to the officers that the individual involved is emotionally disturbed, that is a factor that must be considered in determining, under Graham, the reasonableness of the force employed.
Id. (emphases added) (internal citation omitted). Here, it was apparent that Ms. Luchtel was “mentally unbalanced” or “emotionally disturbed” in light of her actions and comments that the officers were not the “real police.” Indeed, in his declaration about the incident, Officer Hanley stated that when he saw Ms. Luchtel, he “concluded” that she had a “mental disabil *989 ity.” A reasonable jury could conclude that the officers’ actions of “just march[ing] in” and “grab[bing]” Ms. Luchtel without identifying themselves or saying anything to Ms. Luchtel — when the officers were aware that she was mentally disturbed— unreasonably exacerbated the situation. The court’s opinion wholly fails to include this mandatory mental-disability factor in its analysis when it concludes that no reasonable juror could find that the police used excessive force.
Ill
For the reasons I have discussed under the excessive-force analysis, the officers are also not entitled to qualified immunity.[3] It is true that qualified immunity is “an immunity from suit rather than a mere defense to liability” such that immunity questions should be resolved “at the earliest possible stage in litigation.” Pearson v. Callahan, — U.S. -, 129 S.Ct. 808, 815, 172 L.Ed.2d 565 (2009) (quotation marks omitted). But it is also true that excessive-force cases “almost always turn on a jury’s credibility determinations” and therefore “summary judgment ... in excessive force cases should be granted sparingly” even with respect to the issue of qualified immunity. Smith, 394 F.3d at 701, 704 n. 7. These opposing imperatives make the issue of summary judgment on § 1983 claims tricky indeed. But the balance here tilts in favor of trial.
The right to be free from excessive force in handcuffing is clearly established in our precedent. See, e.g., Meredith v. Erath, 342 F.3d 1057, 1061 (9th Cir.2003) (rejecting qualified immunity because it was “clearly established” that the amount of force used in handcuffing the plaintiff was excessive). This is true even when the plaintiff actively resists handcuffing. See LaLonde, 204 F.3d at 952, 960 (rejecting qualified immunity). As for whether the officers could reasonably have believed that the force they used was reasonable, here, as in many excessive-force cases, the “issue of tight handcuffing is usually fact-specific and is likely to turn on the credibility of the witnesses.” Id.; see Palmer v. Sanderson, 9 F.3d 1433, 1436 (9th Cir.1993) (rejecting qualified immunity where the officer handcuffed the plaintiff so tightly that he suffered pain and bruises).
Qualified immunity is simply not available here where we have a case directly on point demonstrating that it is clearly established that the police conduct was excessive. In Hansen v. Black, 885 F.2d 642, 645 (9th Cir.1989), we unanimously *990 reversed the grant of summary judgment on the excessive force claim where the plaintiff claimed that her “handcuffs were put on in an abusive manner” and “she had bruises on her wrist and under her upper arm, and she complained of pain in her little finger and upper arm.”[4] We denied summary judgment there even though the officers believed the plaintiff was committing the serious offense of assisting a robbery suspect and attempting to destroy evidence. See id. at 643. Under Hansen, qualified immunity is not appropriate. Luehtel’s crimes were less serious, and her injuries were much more severe — a dislocated shoulder, torn shoulder ligaments, a shoulder bone fracture in addition to bruises all over her body. It is clearly established in the Ninth Circuit that causing fractures and dislocating shoulders while handcuffing a suspect is excessive force.[5]
IV
Although I concur in the remainder of the court’s opinion, I must dissent with respect to the excessive-force and assault- and-battery claims. On these claims, the court’s opinion weighs the facts and testimony in this case much as jurors would in the jury room. It concludes that no reasonable juror could conclude that the Seattle Police Department officers used excessive force here. And yet, it leaves out half of the testimony — the other side of the story. We are appellate judges, not jurors. This case should have its day in court.

. I concur in Parts III and VI of the court's opinion. I also would affirm the grant of summary judgment on Ms. Luchtel’s state-law negligence and false-arrest claims.

. Even domestic violence may not always be a severe crime for the purpose of the Graham analysis. See Smith v. City of Hemet, 394 F.3d 689, 701 (9th Cir.2005) (holding that the severity of the crime provided little basis for the officers use of force where the victim-wife called 911 to report that her husband “was hitting her and/or was physical with her” because the plaintiff-husband was separate from his wife and had no access to weapons).

. Similarly, Ms. Luchtel’s state law assault and battery claims should go to the jury. In Washington, claims that the police used excessive force during arrest are brought as assault and battery claims, see Boyles v. City of Kennewick, 62 Wash.App. 174, 813 P.2d 178, 179 (1991), and qualified immunity is not "available for claims of assault and battery arising out of the use of excessive force to effectuate an arrest,” Staats v. Brown, 139 Wash.2d 757, 991 P.2d 615, 627-28 (2000) (en banc). As I have discussed, there are genuine issues of material fact as to whether the officers used excessive force so qualified immunity is inappropriate under Washington law. Also, the officers are not immune under Revised Code of Washington section 71.05.120, which provides that "no[] peace officer ... shall be civilly or criminally liable for performing duties [relating to the decision to admit a person for mental] evaluation and treatment: PROVIDED, That such duties were performed in good faith and without gross negligence.” Ms. Luchtel has presented sufficient evidence to present a triable question of gross negligence. And in Estate of Lee v. City of Spokane, the Washington Court of Appeals stated that "we cannot find any difference between the question of good faith and the question of federal immunity which turns on whether officers could have believed their conduct to be 'lawful, in light of clearly established law.' ” 101 Wash.App. 158, 2 P.3d 979, 991 (2000) (discussing a similar immunity statute). Thus, Ms. Luchtel's assault-and-battery claim survives state law qualified immunity.

. The court's opinion cites to Jackson v. City of Bremerton, 268 F.3d 646 (9th Cir.2001), arguing that the officers’ force was reasonable because summary judgment was granted in Jackson in favor of the officers "even though the plaintiff's finger was fractured and permanently damaged.” But the facts in Jackson are completely different. There, several police officers confronted a group of 30 to 50 people when they attempted to arrest a suspect with an outstanding warrant for theft. See Jackson, 268 F.3d at 649. When the suspect attempted to flee, "[flights broke out between the officers and other members of [the plaintiff's] group.” See id.

. Hansen was decided before Saucier v. Katz, 533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001), but post-Saucier, we have repeatedly recognized that Hansen is still viable and that it precludes qualified immunity in cases like this one. See Meredith v. Erath, 342 F.3d 1057, 1061 (9th Cir.2003) (citing Hansen for the proposition that “it was clearly established that the amount of force [the plaintiff] says [the officer] used in handcuffing her was excessive, and a reasonable agent in [the officer's] position would have known that such conduct violated the Fourth Amendment”); see also Davis v. City of Las Vegas, 478 F.3d 1048, 1057 (9th Cir.2007) (recognizing Hansen’s continuing viability). The unpublished cases recognizing Hansen after Saucier are even more numerous. See, e.g., Martinez-Rodriguez v. United States, 375 Fed.Appx. 743, 744 (9th Cir.2010); Long v. Pend Oreille County Sheriff’s Dep't, 269 Fed.Appx. 749, 751 (9th Cir.2008). Pearson does not affect what is "clearly established” for qualified immunity.